JOHN MIKLOS AND HELEN MIKLOS, PLAINTIFFS-APPELLANTS, v. LIBERTY COACH CO., INC., AND BORDENTOWN TRAILERS SALES INC., DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued February 3, 1958—Decided February 7, 1958.

Before Judges GOLDMANN, FREUND and CONFORD.

*Miss Ruth Rabstein* argued the cause for appellants (*Pellettieri & Rabstein,* attorneys).

*Mr. George H. Harbaugh* argued the cause for respondent Liberty Coach Co., Inc. (*Messrs. Schneider, Lustbader & Morgan,* attorneys; *Mr. Philip M. Lustbader* and *Mr. Harbaugh,* of counsel; *Mr. James A. Ospenson,* on the brief).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. Plaintiffs appeal from an order of the Superior Court, Law Division, entered on motion

of defendant Liberty Coach Co., Inc. (Liberty), setting aside the service of process allegedly made upon it.

Liberty, an Indiana corporation, manufactures home trailers. On June 29, 1955 plaintiffs purchased a new 1955 Liberty trailer through defendant Bordentown Trailer Sales, Inc. (Bordentown), a New Jersey corporation doing business near Bordentown, N. J. After delivery plaintiffs found that the trailer was damaged and defective. They subsequently returned it to Bordentown which purportedly resold it, but no part of the $2,218.32 paid on account has ever been refunded to plaintiffs. They thereupon brought the present action, the amended complaint naming both Bordentown and Liberty as defendants, and seeking return of the downpayment on the theory of rescission, and damages based on warranty, both express and implied. Among the counts are several demanding damages for injuries suffered by plaintiff Helen Miklos as a result of the defective condition of the mobile unit.

Service of process was made upon Liberty by serving Bordentown through its president Vincent Buettner as "registered agent" of Liberty in this State, which, admittedly, he was not. Liberty, appearing specially, then moved for an order quashing the purported service, the motion being supported by affidavits of an investigator and of its president Spencer. The investigator's affidavit may be ignored because it does not reveal the source of his knowledge and must be considered hearsay. However, Spencer's affidavit recites that Liberty is an Indiana corporation engaged in the manufacture of trailers in that state; that it has no registered agent for service of process, no registered office or indeed any kind of office in New Jersey, and does not do business here; and that all sales are made in Indiana. He further alleges that Buettner, upon whom service was made, is not a trustee, officer, director, manager or general agent, or a servant or employee, of Liberty.

Plaintiffs called Buettner as their witness at the hearing on the motion. He testified that his company's relationship with Liberty for the past three years had been that of dealer

handling Liberty trailers exclusively, buying the trailers from Liberty and then selling them; that Liberty gives a written guarantee with each trailer sold by Bordentown; that Bordentown did not represent Liberty in any other way and received no compensation from it, but made its profit from the trailer purchasers. He said that when the trailers came into this State, the legal title to them was in Liberty, but there is some question as to whether the witness clearly understood the question put to him at this point because, in the very next question, when asked whether Bordentown was authorized to transfer title for Liberty in New Jersey, he answered "From their certificate of origin, yes"; and when next asked, "you transfer title to the trailer on behalf of the Liberty Coach Company," he replied, "Well they sign the certificate of origin."

(Reference at this point to certain sections of the Motor Vehicle Certificate of Ownership Law, *N. J. S. A.* 39:10–1 *et seq.,* is helpful in understanding the statutory setting of Buettner's testimony. *N. J. S. A.* 39:10–2 distinguishes between a "manufacturer's or importer's certificate of origin" and "certificate of ownership." The former means the original document required to be executed and delivered by the manufacturer to his agent or a dealer, or a person purchasing direct from the manufacturer, certifying the origin of the vehicle. The latter means the document issued in conformance with the act, certifying ownership of a motor vehicle, other than the manufacturer's or importer's certificate of origin. As to the possible doubt projected by Buettner's testimony regarding title to the trailers, see *N. J. S. A.* 39:10–6 which requires every person to have a certificate of ownership for each motor vehicle in his possession in this State, which must be produced upon demand by the Director of Motor Vehicles or a motor vehicle inspector. *N. J. S. A.* 39:10–8 directs that when a new motor vehicle is delivered in this State by a manufacturer to his agent or a dealer, or a person purchasing direct from the manufacturer, the manufacturer shall execute and deliver to his agent or the dealer, or to such person, a certificate

of origin in the form prescribed by the Director of Motor Vehicles, and no person shall bring into this State any new motor vehicle unless he has such a certificate of origin in his possession. *N. J. S. A.* 39:10–10 provides that the seller of a motor vehicle must deliver the certificate of ownership to the purchaser when title passes. The licensing of dealers by the Director of Motor Vehicles to engage in the business of buying, selling and dealing in motor vehicles, is covered by *N. J. S. A.* 39:10–19. And *N. J. S. A.* 39:10–21 requires that all dealers in new and used motor vehicles in this State shall have a certificate of origin, certificate of ownership or registration certificate for all motor vehicles in their possession, to be produced upon demand by the Director of Motor Vehicles or his agent, or by a motor vehicle inspector.)

In his further testimony Buettner iterated that Bordentown was not employed in any way by Liberty or paid by them as an employee. He testified that at the time of service Bordentown was not discharging any duties or doing anything for Liberty except selling their trailers.

The court denied Liberty's motion without prejudice, with permission to renew it before trial. Liberty subsequently moved for reargument upon its motion and presented the affidavit of the Chief of the Certificate of Ownership Bureau, Division of Motor Vehicles, stating that according to the records of that bureau Liberty had filed a certificate pursuant to *N. J. S. A.* 39:10–1 *et seq.* (the Motor Vehicle Certificate of Ownership Law), certifying that Bordentown was its dealer, and that the Director of the Division of Motor Vehicles had issued a license to Bordentown authorizing it to assign a manufacturer's or importer's certificate of origin for Liberty coaches, and to engage in the business of buying, selling or dealing in new and used motor vehicles within this State. A copy of Liberty's certificate designating Bordentown as its authorized dealer, and of the license issued by the Division, was attached to this affidavit.

We also have before us the warranty certificate and service policy which issued when a Liberty trailer was sold. The

service policy proposes to define the contractual relationship between Liberty, its dealers, and the buyer of a Liberty trailer. Under it the dealer is to service a Liberty trailer before and at the time of delivery, and for 30 to 60 days after delivery to service and make any minor adjustments necessary for the proper operation of the trailer. By the terms of the service policy Liberty is obliged, within the warranty period of 90 days from the date of purchase, to repair or replace defective items of workmanship, the result of structural defect. On the reverse side of this service policy is Liberty's certificate stating that the Liberty trailer, when purchased new, is warranted to the original purchaser by the manufacturer for 90 days from date of purchase to be free from defect in materials and workmanship under normal use and service, except for certain items like tires, stoves, refrigerators, etc.

The first question to be decided is whether Liberty was "doing business" within the State of New Jersey and amenable to service of process in this action. Prior to 1945 the power of a state to render a personal judgment against a foreign corporation was variously based on one of three theories. Courts justified their assumption of jurisdiction over and service of process upon foreign corporations by relying on the "consent" theory, the "presence" theory, and the "submission" theory. Well founded objections had been advanced to all of them, the authorities and texts being collected in 16 *Fletcher, Cyclopedia of Private Corporations* (1955 *rev. vol.*), § 8640, *pp.* 125–129. Under these concepts the extent of the activities of the foreign corporation within the state of the forum was of importance. The phrase "doing business," so often used by the courts, expressed a conclusion of fact and denoted the result of a policy judgment. See *Ibid.*, § 8460.1 and *note* 99, *p.* 130, and § 8713.1, *p.* 417.

These fictions were expressly discarded by the United States Supreme Court speaking through Chief Justice Stone in *International Shoe Co. v. State of Washington,* 326 *U. S.* 310, 66 *S. Ct.* 154, 90 *L. Ed.* 95, 161 *A. L. R.* 1057 (1945), where it was said that due process requires only

that in order to subject a foreign corporation to a judgment *in personam*, if it be not present within the territory of the forum, it have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" The demands of due process "may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there." *Fletcher, op. cit.*, § 8713.1, *pp.* 419–420, points up the effect of the *International Shoe* case to be that

"* * * No longer does the court undertake to determine categorically and for all purposes whether a corporation is 'present' within the state. Rather, when a cause of action is asserted against a foreign corporation, the court determines whether its ties and connections with the state of forum, and the extent of its activity therein, are such that it would offend 'traditional notions of fair play and substantial justice' for the court to assume jurisdiction of that particular defendant. In determining this question, the court looks not only to the regularity, continuity and extent of the corporate activity within the state (the principal considerations under the older cases), but likewise looks to two other factors of great importance: (1) whether the cause of action asserted resulted from the corporate activity within the state; and (2) the closely related question of a weighing of the conveniences to the parties. This latter consideration is not unlike that found in the doctrine of *forum non conveniens*."

The most recent application of the *International Shoe* doctrine is found in *McGee v. International Life Ins. Co.*, 355 *U. S.* 220, 78 *S. Ct.* 199, 2 *L. Ed. 2d* 223, decided by the United States Supreme Court December 16, 1957, which held that the Due Process Clause did not preclude a California court from entering a judgment binding on respondent, a Texas corporation which had taken over the insurance obligations of an Arizona corporation, where the insurance contract (the only one ever delivered) had been delivered by mail in California, the premiums mailed from there to respondent's Texas office, and the insured was a resident of California when he died. The court found it sufficient for the purposes

of due process that the suit was based on a contract which had "substantial connection" with California. That state, it said, had a manifest interest in providing effective means of redress for its residents when their insurers refused to pay claims. These residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant state in order to hold it legally accountable.

In this case we find that Liberty was regularly selling its trailers through its dealer, Bordentown, which was authorized by the Division of Motor Vehicles to assign the manufacturer's certificate of origin for every trailer sold. Liberty's warranty certificate and service policy were, we may reasonably assume, handed to the purchaser by Bordentown at the time of the sale, and if that is not the case, forwarded direct to the purchaser by Liberty from its Indiana plant. Plaintiffs alleged in their briefs as well as at the oral argument that Liberty had sent its crews into New Jersey to make repairs and replacements on trailers owned here, and this statement was not denied. And, at least on the record as it now stands, there is some indication that Liberty may have retained title and transferred it to the buyer after Bordentown had made the sale, although the contrary fact—that Liberty gave title to Bordentown and Bordentown then transferred it to the purchaser—seems closer to the truth. See *N. J. S. A.* 39:10–6; 39:10–21.

In any event, under the *International Shoe* and *McGee* cases Liberty had sufficient minimum contacts with New Jersey so that it can be said that the maintenance of this suit does not offend "traditional notions of fair play and substantial justice." These contacts made it reasonable to require Liberty to defend plaintiff's action. *Cf. A & M Trading Corp. v. Pennsylvania R. R. Co.,* 13 *N. J.* 516 (1953); *Daoud v. Kleven Investment Co., Inc.,* 30 *N. J. Super.* 38 (*Ch. Div.* 1954). There can be no question, in the words of Justice Black in the *McGee* case, that "a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and their non-residents," in part "attributable to the fundamental trans-

formation of our national economy over the years." As was there observed, the increasing nationalization of commerce has brought with it a great increase in the amount of business conducted across state lines, with modern transportation and communication at the same time making it much less burdensome for a party sued to defend himself in a state where he engages in economic activity.

Turning from the question of the right of our courts to assert jurisdiction over Liberty, we must now consider whether Buettner (Bordentown) was the proper person to serve to accomplish that end.

*R. R.* 4:4–4(*d*) provides that service upon a domestic or foreign corporation shall be made by serving

"* * * in the manner prescribed in paragraph (a), an officer, director, trustee or a managing or general agent; or if service cannot be made upon any of the foregoing and if there is no office or place of business within this State, by serving any servant of the corporation within this State acting in the discharge of his duties; or by delivering a copy of the summons and complaint to any person authorized by appointment or by law to receive service of process on behalf of the corporation; or by leaving a copy of the same at the registered office of the corporation with any person in charge thereof."

Admittedly, there is no person authorized by appointment or by law to receive service on behalf of Liberty, and it does not have a registered office in New Jersey. It is also admitted that Buettner (Bordentown) is not an officer, director, trustee or managing agent. There is nothing in the record which expressly or impliedly establishes Buettner (Bordentown) to be Liberty's general agent in this State. The question, therefore, narrows itself down to this: Since Liberty has no office or place of business in New Jersey, was Bordentown (Buettner) a "servant" of Liberty within this State, acting in the discharge of its (his) duties, as required by *R. R.* 4:4–4(*d*)?

Subdivision (d) of *R. R.* 4:4–4 is broader than and supplants the former practice at law, *R. S.* 2:26–43 and 44 (not included in *Title 2A*), and the dissimilar practice in

Chancery, *R. S.* 2:29–19 (also not included in *Title 2A*), and to a degree follows *Federal Civil Rule* 4(*d*)(3). See *Tentative Draft of Rules, Rule* 3:4–4(*d*), *comment* 1, *p.* 95 (1948). *Rule* 3:4–4 became *R. R.* 4:4–4. Subsection (d) was amended, effective September 9, 1953, to authorize service upon any servant of a corporation within this State acting in the discharge of his duties where (1) no service can be made upon an officer, director, trustee or a managing or general agent, and (2) the corporation has no office or place of business within this State. Good practice would indicate that before invoking this provision an affidavit be filed showing inquiry and inability to find the named corporate representative or office or place of business within this State. *Schnitzer and Wildstein, New Jersey Rules Service, A IV–55.* Like other modes of service upon foreign corporations, this provision is, of course, ineffective unless utilized against corporations doing business here.

The "any servant" provision for service was added to the rule with the obvious purpose of effecting an enlargement of the scope of permissible service of process. "The rule is fashioned to meet current business exigencies requiring non-restricted access of the process service to corporate entities, * * *." *Wright v. News Syndicate Co., Inc.,* 35 *N. J. Super.* 133, 135 (*Law Div.* 1955), which involved service of process upon defendant's truckdriver who had been delivering newspapers in New Jersey for some eight years and disposed of unsold merchandise for cash.

We do not consider either Buettner or Bordentown the servant of Liberty within the meaning of the rule. The trial court relied upon *Westerdale v. Kaiser-Frazer Corp.,* 6 *N. J.* 571 (1951) in quashing the service. That case is obviously distinguishable on its facts because there the defendant manufacturer sold its cars to a Nevada sales corporation with its principal place of business in Michigan, which in turn assigned title to a Newark distributor who subsequently assigned to the local dealer. The question was whether the latter was the manufacturer's managing or general agent for the purpose of service within this State,

602

under then *Rule* 3:4–4(*d*), which did not contain the "any servant" provision. The court held that defendant was not doing business in New Jersey nor was the local dealer its managing or general agent upon whom service could be made. However, the court went on to say that the fact that the local dealer prominently displayed "Kaiser-Frazer" signs and gave a manufacturer's warranty with every car sold, did not establish it as the agent of the manufacturer. It observed that such practices are commonplace among all dealers who sell products which have a trade name carrying substantial good will.

 "Servant" denotes, if anything, an emphasis on the subordinate character of the agent for service to the principal party defendant—a subservience characteristic of the master-servant relation. "Servant" has been defined as "a person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control." *Reslatement, Agency,* § 220, *p.* 483 (1933). In determining whether one acting for another is a servant or an independent contractor, the following elements are to be considered, among others: (1) the extent of control which, by agreement, the master may exercise over the details of the work; (2) whether or not one so employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular activity; (5) whether the employer or the person doing the work supplies the instrumentalities, tools and the place of work; (6) the length of time for which the person is employed; (7) the method of payment; (8) whether or not the work is part of the regular business of the employer; and (9) whether or not the parties believe they are in the relationship of master and servant. *Ibid.*, and *comments, pp.* 486–493. Generally, see *Mechem, Outlines of the Law of Agency* (4*th ed.* 1952), §§ 413–415, *pp.* 280–281.

Applying these standards, we conclude that Bordentown was not a servant subject to the control or right of control of Liberty, but on the contrary, an independent entrepreneur.

Plaintiff is here contending for the broadened right of the State to hold amenable to process foreign corporations doing business here, by permitting service on persons other than those mentioned in *R. R.* 4:4–4(*d*)—in this case, one who is a dealer in the product of the foreign corporate manufacturer. The rule does not yet so provide, and only through amendment could service on Bordentown bring Liberty before the court. We are bound to follow the rule as it now stands. *X-L Liquors, Inc. v. Taylor,* 29 *N. J. Super.* 486 (*App. Div.* 1954).

Affirmed.