153 N.J. Super. 121 (1977)
379 A.2d 269
ROSEMARIE GILBORGES, AN INCOMPETENT, BY HER GUARDIANS AD LITEM ROSE M. GILBORGES AND ALBERT T. GILBORGES, PLAINTIFFS-RESPONDENTS,
v.
JOHN WALLACE, CROSS COUNTRY EXPRESS, INC. AND ANTHONY F. GIANNINI, DEFENDANTS-RESPONDENTS, AND LINDA A. GIANNINI, DEFENDANT-RESPONDENT AND CROSS-APPELLANT, AND BOARD OF EDUCATION, TOWNSHIP OF MAPLE SHADE, ETC., DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
JOHN WALLACE, THIRD-PARTY PLAINTIFF-RESPONDENT,
v.
UNITED STATES FIDELITY & GUARANTY COMPANY, ET AL., THIRD-PARTY DEFENDANTS-RESPONDENTS.[1]
Superior Court of New Jersey, Appellate Division.
Argued May 24, 1977.
Decided September 22, 1977.
*125 Before Judges LYNCH, MILMED and ANTELL.
Mr. Richard D. Catenacci argued the cause for defendant-appellant (Messrs. McElroy, Connell, Foley & Geiser, attorneys; Mr. Theodore W. Geiser, of counsel).
Mr. Nathan A. Friedman argued the cause for plaintiffs-respondents (Messrs. Friedman & Tighe, attorneys; Mr. Charles I. Tighe III on the brief).
Mr. G. Leslie Manuel, Jr. argued the cause for Cross Country Express, Inc. (Messrs. Kisselman, Deighan, Montano *126 & Summers, attorneys; Mr. Robert T. Zane on the brief).
Mr. Edgar E. Moss II argued the cause for defendant-respondent and cross-appellant Linda A. Giannini (Messrs. Moss, Powell & Powers, attorneys; Mr. Philip R. Lezenby, Jr. on the brief).
No briefs were filed on behalf of third-party plaintiff-respondent and third-party defendants-respondents.
The opinion of the majority was delivered by LYNCH, P.J.A.D.
On December 7, 1973 the 16-year-old plaintiff Rosemarie Gilborges (hereafter Rosemarie), while a passenger in an automobile driven by defendant Linda Giannini (hereafter Linda) and owned by Anthony F. Giannini, was seriously injured[2] as a result of a collision of the Giannini car with a truck driven by defendant John Wallace (hereafter Wallace) and owned by defendant Cross Country Express, Inc. (hereafter Cross Country). The accident occurred at the intersection of Route 73 and Old Fork Landing Road, in Cinnaminson Township. The intersection was controlled by a traffic light and the drivers, Linda and Wallace, respectively claimed that each had the green light at the intersection.
On January 15, 1974 plaintiffs first filed a complaint against defendants Linda, Anthony Giannini, Wallace, Cross Country and 3rd Down Auto Body. On October 23, 1974, after receiving permission to file a late claim pursuant to the Tort Claims Act (N.J.S.A. 59:8-9) against the Board of Education of Maple Shade (hereafter Board), an amended complaint was filed adding it as a defendant.
The claim against the Board was based upon an allegation that at the time of the accident Linda was acting as *127 its agent and servant in that she, with plaintiff Rosemarie and two other girls as passengers, was returning from Cinnaminson High School on a trip sponsored by Maple Shade High School as a function of a Distributive Education class in which the girls were students.[3]
Prior to trial plaintiffs moved for partial summary judgment on the issue of agency of Linda on behalf of the Board. The trial judge determined that an agency relationship did exist between them and summary judgment to that effect was entered, thus generating one of the principal issues here.
Trial was held from June 18 to July 3, 1975 and resulted in a verdict in favor of plaintiff Rosemarie (by her guardians ad litem) in the amount of $1,000,000 against Wallace and Linda individually and the Board by reason of her "agency." Wallace was found to be negligent to the extent of 80% and Linda (and the Board as her principal) to the extent of 20%. Pursuant to those findings a judgment in favor of plaintiffs and against Linda and the Board was entered in the amount of $200,000 and against Wallace in the amount of $800,000.
The Board appeals and defendant Linda cross-appeals.
The contentions of the respective parties on appeal will be considered seriatim.

A

The contentions of the Board
As stated in its brief, the Board contends that:
Point I  The granting of a motion for summary judgment on the issue of agency was reversible error;
*128 Point II  The finding of 20% negligence on the part of Linda A. Giannini, as agent of the Board of Education, is against the weight of the evidence;
Point III  The admission into evidence of the testimony of Dr. Leshner and Mr. Goodfarb resulted in plain error;
Point IV  It was plain and prejudicial error to permit the plaintiff's vocational expert, Dr. Leshner and/or plaintiff's actuary, Mr. Goodfarb, to place before the jury gross dollar total amounts of future pecuniary loss;
Point V  The Court's charge when read in its entirety constitutes plain and reversible error;
Point VI  The summation of plaintiff's counsel was rife with unprofessional conduct and techniques condemned by our Supreme Court;
Point VII  A public entity is not responsible to pay more than its jury-determined share of a comparative negligence award.

I[4]

The summary judgment establishing Linda as agent of the Board
In granting the partial summary judgment declaring that Linda was the "agent" of the Board in the operation of her car at the time of the accident the judge based his conclusion on a finding of fact that she was in such relationship. In the colloquy on the motion he made reference to plaintiffs' requests pursuant to R. 4:22-1 that the Board admit that Linda was its agent. The judge referred to what he termed the Board's "failure to answer the request for admission on the subject of agency." In stating his conclusions on the motion he made no reference to the Board's alleged failure to answer the requests and it therefore might be said that it was not a factor in the granting of summary judgment. However in colloquy on the argument of the motion the judge had said that plaintiffs' requests went "right to the heart of the issue, and there is no answer to it." (Emphasis supplied.)
It is true that the requests had not been answered by the Board within the 30-day time limitation set forth in *129 R. 4:22-1, namely by March 10, 1975. But it was simply not so that there was "no answer to it" at the time of the argument on the motion on May 16, 1975. On April 10, 1975, 41 days before the argument, the Board had filed its denial of agency. Request No. 6 read:
That on the date of the accident alleged in the Complaint the defendant Linda Giannini was required to be a student in the Maple Shade High School from 9:00 a.m. to 1:00 p.m.
(a) That during those hours the defendant, Linda Giannini, was under the direct supervision and control of the administrative personnel, teaching personnel, principals, vice-principal and the like of the Maple Shade High School. [Emphasis supplied]
The Board's April 10, 1975 answer to the foregoing request was:
6. We are unable to admit or deny Miss Giannini's school hours at this time as we are still waiting for her class schedule from the school.

Subsection (a) is specifically denied. [Emphasis supplied]
Request No. 8 demanded that the Board admit:
That on December 7, 1973, one of the defendant Linda Giannini's instructors directed her to drive to Cinnaminson High School during the course of her school day.
And the Board's answer to No. 8 was:
8. Denied.
Thus, contrary to the dissent's statement that "as matters stood at the time of the motion Linda's `agency' was judicially admitted", it had been "specifically" denied. The trial judge took no notice of that denial despite counsel's reminder to that effect. Since, therefore, there existed a genuine issue of material fact from the "admissions on file," summary judgment was precluded. R. 4:46-2.
*130 It is true, as we have said, that the Board's denial was late. But we take issue with the dissent in asserting that to accept the denial out-of-time "goes to the very integrity of the system." And it is saying less than need be said to assert: "Either our Rules mean what they say or they do not * * *." Our "system" is first and foremost a system of justice, not to be frustrated by mechanical application of rules. And when we consider our rules we must consider all of them, including that which provides that "any rule may be relaxed and dispensed with by the court * * * if adherence to it would result in an injustice." R. 1:1-2. Thus it has been said by our Supreme Court: "Rules of court are mechanical aids to the administration of justice; they are designed to effectuate substantive rights, and to this end they are subject to relaxation where their enforcement would work `surprise or injustice.'" Sattelberger v. Telep, 14 N.J. 353, 363 (1954). And by this court, per Goldmann, P.J.A.D.: "The rules are to be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay. They are a means to justice, and not an end in themselves; their purpose is to provide for a just determination of every proceeding." (Emphasis supplied.) State v. Emmett, 108 N.J. Super. 322, 325 (App. Div. 1970). And this is particularly true where the public interest is involved. Cf. Elizabeth Bd. of Ed. v. Elizabeth City Council, 55 N.J. 501, 505 (1970); DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428, 434 (1970). Here the issue of the Board's liability for the acts of a student to the extent of a million dollar verdict was a matter of public interest and it was not to be disposed of by a failure to notice that agency had in fact been denied by the Board.
Further, the rule governing consideration of requests for admissions itself recognizes its subservience to consideration of the merits. It provides that the court may permit amendment of an admission "when the presentation of the merits of the action will be subserved thereby and the *131 party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense in the merits." R. 4:22-2. There was no showing of prejudice by plaintiffs here if the Board's denial were to be accepted as within time, and it was an abuse of discretion not to accept it pursuant to R. 4:22-2.
We note also that plaintiffs' motion for summary judgment on the issue of agency was principally based on the depositions of Linda, her classmate Darlene Doddier (Darlene), who was a passenger in the car at the time of the accident, and Joel Grennor, the teacher of Distributive Education at Maple Shade High School in whose class in that subject plaintiff Rosemarie Gilborges, Linda and Darlene were students.
Linda's deposition was taken on July 18, 1974 before the Board became a party to the action by amendment of the complaint on October 23, 1974. Consequently, the Board was not represented by counsel at the taking of that deposition. When the Board was later made a party its counsel did not move to reopen the deposition. However, considering the leading nature of the questions asked of Linda by plaintiffs' attorney and the factual basis elicited thereby in support of the existence of the alleged "agency" relationship, we conclude that the circumstance of counsel's failure to move for reopening of the depositions does not outweigh the prejudice created by the nature of such questioning in the absence of counsel for the Board, and it is outweighed by the primary objective of considering the merits of the issue in the interest of justice.
On the merits we determine that the entry of the partial summary judgment establishing Linda as "agent" of the Board was erroneous.
Summary judgment is not to be granted unless it is clearly shown that there exists no genuine issue of material fact. It is the movant's burden to exclude any reasonable doubt as to existence of such issue and all inferences of doubt are *132 to be drawn against the movant. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954).
We do not deem it necessary to discuss analytically whether the relationship here disputed is one of "agency" or one of "master and servant," a dichotomy discussed at some length by the Board in this appeal. We are satisfied that it clearly is the latter, for the issue is whether the Board is vicariously liable for the negligence, if any, of Linda in the operation of her car. See Mechem, Outlines of Agency (4 ed. 1952), §§ 12, 13, 412 et seq. The question remains whether Linda was in fact and law the servant of the Board when she operated her car at the time of the accident.
In Andryishyn v. Ballinger, 61 N.J. Super. 386 (App. Div.) certif. den. 33 N.J. 120 (1960), it is said:
Generally speaking, whether a person who performs services for another is a servant or an independent contractor depends upon the control which the employer exercises or retains the right to exercise over the manner in which the worker performs his services. 1 Restatement, Agency 2d, § 220(1), p. 485, and comment, pp. 486-489 (1958); Galler v. Slurzberg, 22 N.J. Super. 477, 487 (App. Div. 1952); Ibid., 31 N.J. Super. 314, 324 (App. Div. 1954), affirmed per curiam, 18 N.J. 466 (1955); 2 C.J.S. Agency § 2 d, pp. 1027-1028 (1963) and 56 C.J.S. Master and Servant § 2 d, pp. 32-37 (1948). The relationship of master and servant is not capable of exact definition. 1 Restatement, Agency 2d, § 220(2), pp. 485-486, lists various factors that may be considered in determining whether one who acts for another is a servant or an independent contractor. Control is only one of them, albeit usually considered the principal one. It has been said that when the manner of performing the service is beyond another's control because of its nature, absence of direct control over such details may become significant in the overall view of the facts and the circumstances to be taken into account in determining the relationship. DeMonaco v. Renton, 18 N.J. 352, 357 (1955) (newsboy), quoting from Hearst Publications v. United States, 70 F. Supp. 666 (D.C. Cal. 1946), affirmed 168 F.2d 751 (9 Cir. 1947); Hannigan v. Goldfarb, 53 N.J. Super. 190, 196 (App. Div. 1958) (taxicab driver). Whether Ballinger was, in fact, an employee of Bayonne Block Co. must be determined in the light of the totality of the facts surrounding the relationship. [at 391]
And in Miklos v. Liberty Coach Co., 48 N.J. Super. 591 (App. Div. 1958), it was said:
*133 "Servant" denotes, if anything, an emphasis on the subordinate character of the agent for service to the principal party defendant  a subservience characteristic of the master-servant relation. "Servant" has been defined as "a person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control." Restatement, Agency, § 220, p. 483 (1933). In determining whether one acting for another is a servant or an independent contractor, the following elements are to be considered, among others: (1) the extent of control which, by agreement, the master may exercise over the details of the work; (2) whether or not one so employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular activity; (5) whether the employer or the person doing the work supplies the instrumentalities, tools and the place of work; (6) the length of time for which the person is employed; (7) the method of payment; (8) whether or not the work is part of the regular business of the employer; and (9) whether or not the parties believe they are in the relationship of master and servant. Ibid., and comments, pp. 486-493. Generally, see Mechem, Outlines of the Law of Agency (4th ed. 1952) §§ 413-415, pp. 280-281. [at 602]
And in Annotation, "Schools  Tort Liability  Student's Acts," 36 A.L.R.3d 330, 339 (1971), it is said:
Generally speaking, a school district, school board, or other agency or authority in charge of public schools or a public institution of higher learning is not liable, as such, for acts or omissions of pupils or students, since usually no relationship of respondeat superior exists between the district, agency or authority on the one hand, and the pupils or students on the other.
See also Annotation, "Private Schools  Torts  Supervision," 39 A.L.R.3d 908, 915 (1971).
Whether the relationship of respondeat superior exists here remains to be determined.
In consideration of that issue note may be taken of several factors which may be contraindicative of a master-servant relationship in the circumstances of this case: the fact that the "instrumentality"  the automobile  was owned not by the Board but by Linda's father; the fact that the Board received no pecuniary benefit from her actions, see *134 Kligman v. Wilfred Company of Newark, Inc., 91 N.J. Super. 591, 596 (App. Div. 1966), and Linda was not to be paid for driving; the issue as to whether, when the students left Maple Shade to go to Cinnaminson, they were released from their own school and, after their visit to Cinnaminson, were free to go either to their jobs or to go home; did the teacher, Grennor, direct Linda to drive to Cinnaminson, and did he exercise control over her trip, or in fact did he have the right to control her as she drove to Cinnaminson or in returning therefrom?
It must be stressed that recitation of the foregoing factors is not to be taken as an intention on our part to suggest that any one, or more, shall be controlling, or all-inclusive, or whether there may be other facts or inferences which may indicate the existence of a master and servant relationship of Board and Linda at the time of the accident. We recite the various considerations solely in our review of the granting of the partial summary judgment by the trial judge.
Because we find that there are issues of material fact, and that various inferences may be drawn from the facts, we conclude that the issue of the Board's liability for the acts or omissions of Linda was not properly a matter for summary judgment and that the issue should have been submitted to a jury. The order for partial summary judgment is therefore reversed for proceedings on that issue in accordance with the views herein expressed.

II

The finding that Linda (as agent for the Board) was 20% negligent
Defendant Board (and Linda) argue that this finding by the jury was against the weight of the evidence.
The trial judge denied defendant Board's motion for a new trial. We may not reverse unless such ruling was a miscarriage of justice under the law. R. 2:10-1. We find *135 no such error. The order denying the motion for a new trial on this ground is therefore affirmed.

III

Admission of the testimony of Mr. Goodfarb and Dr. Leshner

(a)

As to Mr. Goodfarb
Defendant Board first argues that the trial judge erred in permitting plaintiffs' actuarial expert, Leonard Goodfarb, to testify even though no written report by him was submitted to defense counsel as required by R. 4:17-4(a) and R. 4:17-7.
When Goodfarb was called to the stand counsel for defendant objected to his testimony because of lack of his report. Counsel for plaintiff stated that the witness had not submitted a written report. Indeed, he had only been contacted by plaintiffs' attorney the night before he was called and was then, for the first time, given the statistical data, supplied by plaintiffs' other expert, Dr. Leshner, upon which Goodfarb would base his actuarial testimony relating to the alleged economic loss suffered by Rosemarie as a result of the accident.
The trial judge gave considerable thought to the lack of a written report by Goodfarb. The judge offered to extend cross-examination of the witness until defense counsel had an opportunity to obtain expert advice in preparation. He also ordered a recess in which the witness was to display to the defense the memoranda he had made in preparation for his testimony, and he was to give a statement of his conclusions and the theory upon which they were based. The witness prepared such a document and it was furnished to defense counsel. He was then cross-examined by counsel for defendants Giannini. This was on Thursday, June 26. The case was continued over the weekend to Monday, June *136 30, when he was cross-examined by counsel for defendants Wallace and Cross Country. That cross-examination continued on Tuesday, July 1 and on that day he was cross-examined by counsel for defendants Giannini and the Board.
All defense attorneys had at least a three-day weekend, if needed, in which to prepare for the cross-examination of the witness. There was no abuse of discretion in the trial judge permitting Goodfarb to testify in the absence of a prior written report. The ruling in that respect is affirmed.

(b)

As to Dr. Leshner
Since Rosemarie was a senior in high school at the time of this accident which rendered her totally disabled, plaintiff presented Dr. Saul L. Leshner, an expert in manpower development, personnel administration, the job market and development of employability, in support of her claim as to prospects of employment if she had not suffered the injuries incurred in this accident and her loss of subsequent earnings suffered thereby. Dr. Leshner presented to the jury three categories of potential loss of earnings in areas where she may be deprived of such earnings by reason of her injuries: (1) if she had completed high school only; (2) if she had become a college graduate, and (3) if she were ultimately to become a practicing veterinarian (a field in which she had expressed an interest).
The witness testified that his estimate of the working life expectancy of a female high school graduate was approximately 32 years and that the average income for such a graduate is $10,500 a year. However, he omitted to estimate a gross amount of what she would lose if she possessed a high school diploma.
With respect to female college graduates Dr. Leshner testified that the expectancy of work life would be 36 years and that by reason of Rosemarie's injuries, and assuming she would probably have become such a graduate, she would *137 therefore probably suffer a gross loss of approximately $540,000 in earnings. Finally, he testified that she would probably suffer loss of earnings of approximately $1,000,000 based upon the assumption that she would earn that amount during her work life expectancy if she were to become a practicing veterinarian.
With respect to Dr. Leshner's testimony the Board contends that (1) his opinion was unacceptable because it merely projected the prospective gross amount of Linda's loss of earnings and did not reduce it actuarially to the present value of such loss, and (2) there was no factual basis in the record to support the assumption that either (a) she would have become a college graduate, or (b) would have become a veterinarian.
We are satisfied that, considering the experience and competence of Dr. Leshner, his opinion that Rosemarie would probably have become a college graduate was within his expertise and was competent. While there was strong evidence in contradiction of his opinion to that effect (e.g., she had not taken her preliminary College Boards (P.S.A.T.) or applied for admission to any college though the accident occurred in the month of December of her junior year), nevertheless there was sufficient in his testimony to warrant submission of its validity to the jury in this respect.
On the other hand, we conclude that Dr. Leshner's opinion that Rosemarie would probably have become a practicing veterinarian was without evidential foundation. Cross-examination developed that there is no veterinary school in the State of New Jersey and only one in the State of Pennsylvania, with consequent grave difficulty of a student from New Jersey obtaining admission to such school. We find no support in the record for the conclusion that Rosemarie would probably have become a veterinarian student or graduate. We therefore consider that the assumption was purely speculative and Dr. Leshner's opinion both as to the probability that (a) she would become a veterinarian and (b) she would have earned approximately $1,000,000 in that *138 practice was likewise speculative. The ruling supporting admission of the opinion with respect to Rosemarie's becoming a veterinarian is therefore reversed.

IV

Presentation of alleged gross figures as to Rosemarie's loss of future earnings
On this issue the substance of Dr. Leshner's testimony was that if Rosemarie became a college graduate she would lose on the average of $14,000 to $16,000 a year and, as we have said, for the 36 years of her work expectancy her gross loss of earnings would thus amount to approximately $540,000. Based upon Dr. Leshner's testimony Goodfarb testified that, adding a factor for future inflation to the $14,000 level, the present value of the projected loss of earnings would be $700,000; at the $16,000 level with similar consideration of probable inflation the present value would be $800,000, and at the $25,000 level with the same considerations the present value would be $1,250,000.
The sum of the testimony of the witnesses Goodfarb and Leshner therefore did not constitute a presentation to the jury of "gross" figures because Goodfarb actuarially reduced the gross figures to their present value. In the light of the judge's charge covering the issue of loss of earnings, we find there was no prejudicial error committed in this respect.

V

The judge's charge
The Board contends that there was plain error in the judge's charging the "right of way" section of the Motor Vehicle Act (N.J.S.A. 39:4-90) in the context of an intersection controlled by traffic lights, as was the situation here.
It is true that under the circumstances presented it is erroneous to charge the right of way statute. See DePolo v. *139 Caplan, 119 N.J. Super. 56 (App. Div. 1972). However, it was the Board's counsel who requested the charge and any error which may have existed may not now be availed of by the Board. Schult v. H. & C. Realty Corp., 53 N.J. Super. 128, 136 (App. Div. 1958).
The Board next complains that the charge erroneously applied the principle of Rekiec v. Zuzio, 132 N.J. Super. 71 (App. Div. 1975), which held that a driver's right to proceed through a controlled intersection was "subject to the safety of others," and that "[w]hile a jury may properly conclude that the driver favored by a green light will be acting reasonably if he makes only cursory observations of the intersection he is entering as contrasted, for example, with the weightier obligation imposed upon a driver going through a stop sign, they may not absolve him completely from any duty of observation in this regard."
We find that the language of the charge substantially complied with Rekiec and there was no plain error in the charge as given.

VI

The summation by plaintiffs' attorney
Ordinarily the attacks now made by defendants on the summation of plaintiffs' counsel would not be cognizable on appeal because (a) no objection to the remarks was made at trial[5] and (b) the Board has improperly included in its appendix matter not part of the record below and which therefore would not properly be part of the record on appeal absent a motion to supplement the record, i.e., a lecture given by plaintiffs' attorney to a group of lawyers after the trial below and referring to his summation in this case as a "Model Summation." Because of its relevancy in demonstrating counsel's conscious purpose to improperly influence *140 the jury we, on our own motion, permit supplementation of the record by inclusion of counsel's lecture.
We consider defendants' objections herein for several reasons: (a) some parts of the summation are so clearly in violation of standards of propriety heretofore clearly laid down by our Supreme Court that they must be noticed as plain error; (b) as evidenced by counsel's later lecture on "Model Summation," the improprieties were not inadvertent but purposely projected; (c) for prophylactic purposes our observations thereon may be noticed by plaintiffs' counsel on the retrial which we hereby order, as well as by other attorneys who may erroneously consider the summation herein as a model to be followed, and (d) since there is to be a retrial on damages it is hoped that a deserved verdict at that trial may not be nullified by unnecessary and prejudicial remarks of counsel, however motivated they may be by counsel's zeal for his client's cause. During the course of his summation counsel for plaintiffs said:
* * * How do you compensate somebody for pain and suffering? If you go to a movie, you pay three dollars or four dollars or five dollars for two hours of enjoyment. How much is one hour of pain and suffering worth? You have to decide that.
That's the big thing. That's the thing that's going to make your figure, if you do give it, reasonable and adequate compensation, if you do give her what's truly what she should receive for what she's gone through and will go through in the future.
It is the established law of this State that counsel may not state to a jury in opening or closing his belief as to pecuniary value or price of pain or suffering per hour, per day or per week since such suggestions by counsel constitute an unwarranted intrusion into the domain of the jury and import into the trial elements of sheer speculation on a matter which by universal understanding is not susceptible of valuation on any such basis. Botta v. Brunner, 26 N.J. 82, 100-103 (1958). The quoted excerpt from the summation of plaintiffs' counsel is an oblique, but nevertheless transparent, attempt to circumvent the principles of Botta. It would *141 equate the price per hour for pain and suffering to the cost of admission to a movie.
Again counsel for plaintiffs said to the jury:
I cannot believe  I refuse to believe  that the people of Burlington County, that you ladies and gentlemen of the Jury, can value life any less valuable than the people in New York, or Boston, or Chicago, or Philadelphia. I cannot believe that you think in lower figures of the value of a person's normal everyday habits.
It is perfectly clear that what juries in the big cities of New York, Boston, Chicago or Philadelphia may award is totally irrelevant to the issue of reasonable compensation on the evidence in this case. We conceive that no further discussion is necessary to label the reference to verdicts in the big cities as prejudicial error.
And the reference to the big cities was not without design. In the appendix submitted to this court by defendant Board there is included an excerpt from the lecture given by plaintiffs' attorney in this case on December 6, 1975, shortly after the verdict herein. In that lecture counsel recalls the summation which he gave on behalf of Rosemarie Gilborges. He referred to the fact that he equated the cost of pain and suffering to the $3, $4 or $5 admission price to the movies for two hours of enjoyment. He recalled his comment which insinuated the kind of a verdict which juries from New York, Boston, Chicago or Philadelphia might have rendered. And he said to his audience at the lecture:
Now, I don't do it purposely. I didn't realize I was doing it. I was caught up in the emotions, and the injuries of this girl's case.
Everything I said then, unlike now, because this is kind of a lecture and exchange of ideas thing. Everything I did then was automatic off the top of my head without writing it down. It belonged. But somewhere in the back of my brain I knew that somewhere somebody on that jury had read about a million dollar verdict for somebody else, somewhere else.
It was necessary for me to challenge the jurors to the effect that they could evaluate money values and damages and injuries as well as any other person in  naturally I picked big cities, sophisticated cities, cities where there might have been such verdicts.
*142 Further in his summation counsel said:
And Dr. James said there was seven million nerve cells in each hemisphere of the brain, and that as a result of this accident various nerve cells in her brain have been irreparably damaged.
I don't know how much each brain cell is worth. I don't know how much each sigh is worth, each cry is worth, each laugh is worth.
And in his lecture he advised his lawyer audience:
Now, after talking about the injuries, I got into the real loss, the loss that you have to evaluate. The real loss in my mind is astronomical. And again you use words  like astronomical. You use words like "big case". You use phases [sic] like "the millions of ways that she won't be able to talk or the millions of" yeah, I know, but you see, it all boils down to being able to get them to empathize with this girl in terms which they can then translate into dollars and cents.
And again, in his lecture, speaking of the jury, counsel said:
They had heard formulas, and they could use those formulas and they could throw those formulas out if they wanted to, because I really didn't care because the really significant injury was the fact that this girl could not do the millions of things  and again I used the word as much as I could  the millions of things that she could do if she had not been injured in this accident. [Emphasis supplied]
Finally, in his summation counsel said:
And she was the only child of Mr. and Mrs. Gilborges. What kind of people are we talking about? We're dealing with people who are ordinary, hardworking people, a man who had been working for twenty-some years, and a woman who had been working up till the time of this tragic incident. They have one child. Do you know how much that means? Do you know how much that's worth? Can you count it?
Can you assess a value commensurate with the kind of injury this is? Are you capable of that?
Obviously the emotional loss of the parents was beyond measure. But under our law it is not a proper consideration in assessing the damages which were to be recovered either by Rosemarie or her parents.
*143 Considering the summation as a whole we conclude that it created plain, and prejudicial, error. On this and other grounds discussed in Points III(b) and VI above the award of damages in the amount of $1,000,000 is reversed and a new trial on damages is ordered.

VII

The Board's alleged limitation of liability to its 20% share of negligence
The Board's argument in this respect is expressed in Point VII of its brief: "A public entity is not responsible to pay more than its jury-determined share of a comparative negligence award." The contention is grounded upon an analysis of the respective provisions of the Comparative Negligence Act, N.J.S.A. 2A:15-5.3, and the Tort Claims Act, N.J.S.A. 59:1-1 et seq.
This point was not raised below though that fact is not noted in the Board's brief. For that reason the brief is in violation of R. 2:6-2(a) which provides, so far as pertinent, that "It is mandatory that any point not presented below be so indicated by including in parenthesis a statement to that effect in the point heading."
While we recognize that we might permit the issue to be raised anew, we consider that in this case the interests of justice do not permit the further delay which will follow injection of this new issue with possible further appeals with respect thereto. We therefore reject the Board's contention raised by its Point VII.

B

Contentions of defendant Linda (not subsumed in contentions of the Board under A above)
The brief filed by defendant Linda asserts that it relies upon the contentions of the Board with respect to "the jury determinations of the comparative negligence of the respective *144 parties and of the quantum of damages." Presumably, therefore, this defendant relies on Points II, III and IV raised by defendant Board and discussed under section A hereof.
In addition Linda contends:
It was error to deny the motion of defendant Linda A. Giannini for summary judgment on her cross-claim against the Board of Education, Township of Maple Shade for indemnification.
It was error to dismiss the complaint and counterclaim against the defendant Cross Country Express, Inc. because genuine issues of material fact existed, requiring resolution by the jury, as to the agency of John Wallace and as to whether he was within the scope of his employment at the time of the accident.
We conclude that there is no merit to either contention raised in the brief on behalf of Linda. The orders with respect thereto are affirmed for the reasons stated by the trial judge.

C

As to defendant Wallace
We are in receipt of a letter dated March 11, 1977 from the attorney for defendant Wallace wherein he acknowledges Judge Matthews' order of March 3, 1977 directing that a brief be filed on his behalf by March 17. Wallace's attorney also states that he does not desire to file a brief on Wallace's behalf. Therefore the judgment against Wallace will be affirmed except insofar as it may be affected by our determination on the issues discussed above and as demonstrated in our conclusions below.

CONCLUSIONS
1. The judgment of the trial court is affirmed insofar as (a) it determined that defendants John Wallace and Linda Giannini were guilty of negligence which was a proximate cause of the accident, and (b) it determined that 80% of the total negligence is attributed to the negligence of John Wallace and 20% of the total negligence is attributed to the negligence of Linda Giannini.
*145 2. The summary judgment determining that defendant Linda Giannini was acting as the "agent" of defendant Board of Education, Township of Maple Shade, at the time of the accident is reversed and the matter is remanded to the trial court for a trial on that issue in accordance with the views herein expressed.
3. The judgment awarding damages in the amount of $1,000,000 in favor of plaintiffs and against defendants Linda Giannini and John Wallace is reversed and the issue of damages is remanded to the trial court for a new trial on that issue.
4. The trial judge's dismissal of the complaint and crossclaim against defendant Cross Country Express, Inc. is affirmed.
5. The order of the trial judge denying the motion of defendant Linda Giannini for summary judgment on her crossclaim against the Board of Education, Township of Maple Shade, for indemnification and dismissing said crossclaim is affirmed.
6. The new trial shall be scheduled as expeditiously as possible.
ANTELL, J.A.D. (dissenting).
I share my colleagues' uneasiness about the judgment under review. Nevertheless, it is legitimately a product of the adversary process, and although the manner in which the system functioned in this case is not free of fault, we should refrain from interfering with the result. No legal basis has been demonstrated for disturbing either the summary judgment as to agency or the award of damages.
In the Introductory Statement to their brief the Board's appellate counsel, replacing trial counsel, submitted the matter in the following words:
A motion for summary judgment seeking to establish agency between a student, Linda Giannini, and the Board of Education, went virtually unopposed. * * * Trial counsel's failure to vigorously oppose that motion, which was totally dispositive of the Board's liability, on the facts and the law is simply unexplainable.
*146 This is a fair statement of the case. There was an almost total absence of advocacy on behalf of the Board in response to the motion for summary judgment. Neither an answering brief nor an opposing affidavit was filed, and at the argument counsel for the Board said little more than that the trial judge had the option of deciding the motion in favor of plaintiffs or the Board, depending on how he viewed the evidence. Notwithstanding these delinquencies I might still favor a reversal of the summary judgment were it not for the critical fact that as matters stood at the time of the motion Linda's "agency" on behalf of the Board was judicially admitted. Although the trial judge made no express reference to this in his conclusions, the following colloquy leaves no doubt that it was prominently in his mind:
THE COURT: What do you say with respect to your failure to answer the request for admissions on the subject of agency?
[COUNSEL FOR BOARD]: We argued that a couple of weeks ago at length and I can't add any more than I did at that time. Records have been destroyed at the end of the year and they had to be put together by interviews with various teachers and so on. We ultimately have been able to get information which we supplied him.
THE COURT: Well, the requests, themselves, number one, asks that the answer indicate that each of the following statements is true:
The defendant, Linda Giannini, was on the business of the defendant, Board of Education, at the time of the accident.
Two: That the defendant, Linda Giannini, was the agent of the Board of Education, at the time of the accident.
Those two themselves it seems to me go right to the heart of the issue, and there is no answer to it.
At that juncture counsel advised the judge that Answers to the Requests had by then been served, but, as he fully understood, because this was done beyond the time limited by the Rules of Practice the matter stood admitted. The Requests were served February 7, 1975 and under R. 4:22-1 they are deemed admitted "unless, within 30 days" the party served either denies the matter or serves an objection thereto. In *147 this case the 30 days expired March 10, but no denial was served until April 10, 1975. Under R. 4:22-2 the matter admitted "is conclusively established unless the court on motion permits withdrawal or amendment of the admission."
Whether the trial judge relied on the admission is beside the point. What is vital is that by reason of the Board's failure to serve denials or object to the Requests within 30 days the admission was properly before the court and has never been withdrawn. Indeed, the Board has not so much as requested withdrawal, an omission which continues to the present time, nor even cited any facts appearing in the record which would merit such relief if it was requested. Under these circumstances I do not understand how the majority can characterize the failure to accept the denial "as within time" as an abuse of discretion by the trial judge.
Responsibility for seeing that the admission was withdrawn certainly did not rest with plaintiffs, and it would have been presumptuous for the judge to have done so when this was not even requested by the Board. Certainly no sound reason is presented to permit withdrawal of the admission now, after a trial and the entry of judgment, and in the absence of grounds supporting such action or a request by the Board, on notice to plaintiffs, that this be done.
Additional circumstances underscore the injustice of allowing such relief. Sensing a possible problem after he was served with the late denial, and seeking to remove any lingering doubt from the situation, counsel for plaintiff took the unusual step of applying, by motion returnable April 18, 1975, following the late service of the Board's denial, for an order that the matter be "deemed to have been admitted." No order was entered following that motion, but we were advised by counsel at oral argument that the judge hearing the motion expressed the view that the rule spoke for itself and that an order declaring the matter admitted was not required.
Plaintiffs therefore gave notice going beyond the requirements of the rules that they intended to hold the Board to *148 the admission and were relying upon the record. Furthermore, plaintiffs' brief in support of the motion expressly stated that since the Requests for Admission were not answered within the time allowed under R. 4:22-1 "they are as a matter of law deemed to be true." It is difficult to imagine what more could have been done to forewarn the Board as to the consequences of its position. Is the possibility not at least to be considered that the Board has failed to apply for withdrawal or modification of the admission for the simple reason that it has no good grounds to offer in support of such an application?
Under these circumstances, where is the injustice about the summary judgment which was entered? Whatever distinctions may be drawn between the relationships of principal-agent and master-servant, there is no doubt that the purpose of the Request was to establish the vicarious liability of the Board for the negligence of Linda. This was a proper subject of inquiry. See Appendix II, Rules of Practice, Form E, Uniform Interrogatories By Plaintiff in Motor Vehicle Collision Case, County District Court: "1. With respect to the collision referred to in the complaint filed herein: * * * (c) Do you admit agency?" In the face of this admission there is no justification for relieving the Board from the summary judgment simply because, as the majority finds, a fact question might have been projected at the motion absent the admission.
The issue is one which goes to the very integrity of the system. If the standards by which we are governed are to have any meaning we are not at liberty to brush them aside when they interfere with a desired result. Either our Rules mean what they say or they do not, and when, without any legal or equitable rationale, we ignore facts "conclusively established" by the clear mandate of the rule, we undermine the very concept of justice according to law.
The Board had full notice and an opportunity to be heard at every stage of the proceeding. It knew exactly what was happening, but simply refused to act. Apart from encouraging *149 indifferent and negligent practice, by not allowing the law to take its course in this case the court reflects distrust of the system which we serve and substitutes vague notions of "justice" and the authoritarian preferences of appellate judges for legal rules based on tested principles and a clear analysis of the issues. If, as the Board's appellate counsel implies, there is an injustice in visiting "a million dollar verdict on a nonculpable defendant" because of trial counsel's "lapse of diligent advocacy," logic suggests that the Board's redress should lie with their trial counsel, not with the innocent plaintiffs who have acted openly and without stealth and in reliance upon codified procedures. In my judgment the court closes its eyes to the injustice it visits upon this afflicted family which, through no fault of its own or its counsel's, must now bear anew the cost in money, time and anguish of a new trial and its attendant uncertainties.
Before proceeding to that part of the appeal dealing with the remarks of plaintiffs' counsel in summation I must record my disagreement with the court's consideration of material, consisting of the transcript of a lecture given by plaintiffs' counsel shortly after the return of the verdict herein, which clearly lies outside the record of this case. The majority acknowledges that the matter was "improperly included" by the Board in its appendix. Nevertheless, not only does the court on its "own motion" permit it to be brought into the record, but assigns the material decisive importance in reaching its conclusion that plaintiffs' summation constituted reversible error. This is done without application by the Board for this relief, without notice to plaintiffs, and without any opportunity accorded plaintiffs' counsel to explain his remarks or answer as to the accuracy of the material. Because I regard this action by the court as lying beyond our original jurisdiction on appeal I respectfully dissent therefrom.
The overall effect of what is said during a trial is only partially conveyed by a printed transcript. Hence, we place great store in the evaluation made by the trial judge who *150 had the "feel" of the case and who is better qualified to make a judgment in context as to the sense of what was said. In this case the trial judge denied the application for relief from the judgment, and from this it must be concluded that by his assessment the summation was not prejudicial.
The silence of defendants' counsel throughout plaintiffs' summation should also be considered. Not only was the defendant Board represented during the summation, but defendants Wallace and Giannini were also represented. None voiced their objection, and the test is whether plain error was committed, i.e., whether it "possessed a clear capacity to bring about an unjust result." State v. Melvin, 65 N.J. 1, 18-19 (1974); State v. Hock, 54 N.J. 526, 538 (1969); Atlas v. Silvan, 128 N.J. Super. 247, 252 (App. Div. 1974). The failure of all three defense counsel to object gives rise to the inference that they did not consider the summation out of bounds. See e.g., State v. Thornton, 38 N.J. 380, 399 (1962).
While counsel's attempt to equate time periods of pain with money damages seems to run afoul of Botta v. Brunner, 26 N.J. 82, 100-103 (1958), I do not feel that it constitutes plain error. Nor do I find any such error in the statement of disbelief by counsel that "the people of Burlington County" value life any less than people who live in New York, Boston and other large cities. The majority finds it constitutes "prejudicial error" because the allusion to big-city juries was "totally irrelevant" and because in the back of his mind counsel hoped the jury would remember reading about a million dollar verdict elsewhere. Perhaps it was irrelevant, as are many things that are said in the course of the ordinary trial. But this was perfectly harmless rhetoric to which no objection was made.
Speculations about the effects of such animadversions upon the deliberative processes of a jury make interesting lecture room material for a lawyer intent on emphasizing the role played by his real or fancied strategy in bringing about a successful verdict. But I regard the results professedly calculated *151 by counsel as most improbable and cannot conceive how his remarks could have so fired the passions of the jury as to justify application of the plain error rule.
The reference to the testimony of Dr. James concerning seven million brain cells in each hemisphere of the brain and the accompanying remarks concerning them were also harmless and were not objected to. They would be completely overlooked were it not for the fact that in his lecture, which the Board made part of its appendix on appeal, plaintiffs' counsel said that this was intended as a coded transmission to the jury to return a million dollar verdict.
In placing the emphasis it does upon counsel's post-verdict lecture the court communicates effectively the message: "Don't give lectures." The point has considerable merit, but the cost of this lesson is a heavy exaction to impose upon the litigants. The effect of the summation should be gauged, therefore, from the meaning ordinarily attributed to counsel's chosen language, detached from the exotic claims which he may have made for it in retrospect.
The lecture, apparently, was given at the invitation of a lawyers' group interested in hearing about the development of a personal injury case which yielded a verdict for one million dollars. Obviously, it would not have been enough to say only that the jury compensated plaintiffs according to legal principles explained by the trial judge. Thus, the lecture credits the result to counsel's ingenuity in speaking about the "millions" of things the girl could no longer do (a comment, incidentally, I am unable to find in the transcript of the summation) and "millions" of brain cells and juries in big cities. If, as he claimed, his purpose was to penetrate the jury's consciousness with a forbidden message, this certainly eluded the attention of the experienced defense counsel and the experienced judge who presided at the trial. I wonder how much greater sensitivity could have been expected of the jury.
With respect to the testimony of Dr. Leshner, I disagree that prejudice followed from the fact of his assumption that *152 the injured plaintiff would have gone on to veterinary school had she not been injured, and by measuring her prospective loss of earnings on that hypothesis. This was only the doctor's assumption. In the last analysis it was for the jury to determine whether her attending veterinary school was a reasonable probability and whether the assumption was supported by the evidence. If the jury did not accept the hypothesis that the girl would have gone on to professional school, then it would not have accepted the witness' opinion of potential loss of earnings to the extent that it was based thereon. The evidence pro and con was there to be considered by the jury, and I find no prejudicial error in receiving the Leshner opinion.
I would affirm the judgment below.
NOTES
[1] This third-party action concerning issues of insurance coverage is not involved in this appeal.
[2] Rosemarie's injuries were catastrophic, leaving her totally disabled.
[3] The complaint against 3rd Down Auto Body was dismissed before trial. The complaints against Anthony F. Giannini and Cross Country Express, Inc. were dismissed at trial on the grounds that there was no "agency" relationship between Linda and her father or between Wallace and Cross Country. Such dismissals are not in issue on this appeal.
[4] Points II, III, IV and VI are also relied upon by defendant Linda.
[5] New counsel for the Board has been substituted on this appeal.