823 F.2d 735
 Noelia RODRIQUEZ, Administratrix of the Estate of Carlos A.
Rodriquez and Administratrix Ad Prosequendum of
Carlos A. Rodriquez, on behalf of his heirs- at-law
v.
The UNITED STATES of America, Days Flying Service, Inc.,
Liberty Aviation, Inc. & Manuel Diaz.
Joyce THOMAS, Administratrix of the Estate of Haynesly S. Thomas
v.
UNITED STATES of America, Liberty Aviation, Inc., and Manuel Diaz,
v.
Noelia RODRIQUEZ, Administratrix of the Estate of Carlos A.
Rodriquez, and Administratrix Ad Prosequendum of
Carlos A. Rodriquez, on behalf of his
heirs- at-law.
Appeal of UNITED STATES of America, Appellant in No. 86-5099.
Appeal of Noelia RODRIQUEZ and Joyce Thomas, Appellants in
 No. 86-5147.
 Nos. 86-5099, 86-5147.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 20, 1987.
Decided July 8, 1987.
 
 Richard K. Willard, Asst. Atty. Gen., Thomas W. Greelish, U.S. Atty., Mary Catherine Cuff, Asst. U.S. Atty., Gary W. Allen (argued), Director, Torts Branch, Civ. Div., Dennis F. Carroll, Trial Atty., U.S. Dept. of Justice, Washington, D.C., for U.S.
 Alan Y. Medvin, Medvin & Elberg, Newark, N.J., for Noelia Rodriquez.
 Francis G. Fleming, Steven R. Pounian (argued), Kreindler and Kreindler, New York City, for Joyce Thomas.
 William J. Brennan, III, Smith, Stratton, Wise, Heher & Brennan, Princeton, N.J., for Mario Diaz.
 Before SLOVITER, STAPLETON, Circuit Judges, and ROTH*, District judge.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 On a clear summer day, approximately seven private airplanes were practicing landings and take-offs at a New Jersey airport. After another plane received permission from the control tower to join the airport traffic pattern, it collided in midair with one of the planes already in the pattern. The two pilots in the incoming plane were killed. The ensuing litigation implicates the obligation of pilots operating under visual flight rules to see and avoid other aircraft.
 
 
 2
 This appeal arises from the district court's finding that the air traffic controller's negligence was the sole cause of the collision. The district court awarded the survivors of the two pilots killed in the collision a total of $2,786,634 in damages from the United States. The appeal raises three issues. First, is the district court's finding that negligence on the part of the air traffic controller was a cause of the collision clearly erroneous? Second, are its findings that the United States failed to prove negligence on the part of the pilots in each of the two planes in the collision clearly erroneous? Third, did the district court err in determining the amount of damages?
 
 I.
 Facts
 
 3
 Many of the facts concerning the circumstances leading up to the collision are undisputed. On the morning of August 29, 1982, Carlos Rodriquez and Haynesly Thomas left Teterboro Airport, approximately ten miles east of Caldwell Airport (Caldwell), flying a Cessna 172M aircraft, call number 98998V (hereafter 98V). Both Rodriquez and Thomas were certified pilots, and the purpose of the flight was for Rodriquez, a certified flight instructor, to administer to Thomas a biannual flight review required by Federal Aviation Administration (FAA) regulations. On the same morning, Mario Diaz, a student pilot certified for solo flight, was practicing touch and go landings at Caldwell.[1] Diaz was flying a Cessna 150M aircraft, call number N912IU (hereafter 21U), leased by Liberty Aviation, Inc., Diaz's flight instructor.
 
 
 4
 Weather conditions at Caldwell were clear with visibility of 25 miles, and air traffic was flying under visual flight rules (VFR).[2] Traffic was using runway 22, which runs south-southwest at a heading of 220 degrees, and was flying a right hand traffic pattern.[3] On duty in Caldwell's air traffic control tower was Michael Finneran, an FAA certified air traffic controller, who was being observed by a trainee. Communications between the tower and Caldwell traffic are recorded. The recording of communications in the time period surrounding the collision was transcribed as part of the FAA package prepared after the collision.
 
 
 5
 At 1317:40, Greenwich Mean Time,[4] 21U was cleared by Caldwell tower to execute its third touch and go landing. 21U did so and, after takeoff, climbed to the specified altitude and executed a 90 degree turn onto the crosswind leg. 21U was sequenced in the traffic pattern behind another Cessna (737), which had been cleared for takeoff at 1317:37. Ahead of 737 was another Cessna (4TF). Behind 21U was another Cessna (40G). 737, 4TF and 40G were all making touch and go landings in the traffic pattern.
 
 
 6
 98V first reported to Caldwell tower at 1319:19 when it entered Caldwell's traffic control area inbound to Caldwell and five miles east. The tower instructed 98V to execute an overhead approach to the airport. It was standard for aircraft coming from the east to cross over the tower on a course perpendicular to runway 22, descend to pattern altitude and enter the traffic pattern on the downwind leg by executing a 90 degree turn to the right. A similar overhead entry was successfully performed by another Cessna, call number 3729F, which began its approach at 1319:01 and was cleared to land and exit the traffic pattern at 1321:14.
 
 
 7
 Many of the additional facts surrounding the midair collision were disputed. The district court made findings as to the positions of various planes at relevant times on the basis of the FAA transcript of controller communications, testimony of eyewitness pilots including Diaz, and testimony of experts who attempted to reconstruct the aircraft positions. These findings are not challenged on appeal as clearly erroneous, and will be used throughout.
 
 
 8
 At 1321:30, 98V reported overhead the tower prefatory to beginning its approach and engaged in the following colloquy with the air traffic controller:
 
 
 9
 1321:32 LC Nine eight victor roger, do you have the traffic coming up on midfield?
 
 
 10
 1321:35 98V Roger sir, affirmative.
 
 
 11
 1321:36 LC OK ... Can you follow that traffic?
 
 
 12
 1321:39 98V OK ... Nine eight victor, request touch and goes, over.
 
 
 13
 1321:41 LC Roger, closed traffic's approved.
 
 
 14
 App. at 2441.[5] At this point, 737 had just passed midfield. Immediately prior to 98V reporting overhead, however, at 1321:16, 737 had reported midfield and had identified itself to the controller by rocking his wings as instructed at 1321:20. The only other plane on the downwind in a position prior to midfield was 21U which at 1321:30 was completing the crosswind leg and turning onto the downwind. Of the planes surrounding 21U and 737, at 1321:30, 40G was on the crosswind leg while 4TF was near completion of the downwind leg.
 
 
 15
 Subsequently, 98V adjusted its heading to enter the pattern behind 737. As it began its entry to the pattern, it was at or slightly above, by a maximum of 200 feet, pattern altitude. Following the course adjustment, the trainee in the Caldwell tower pointed out to the controller the dangerous course that 98V was on with respect to 21U. The controller then engaged in the following exchange with 98V:
 
 
 16
 1321:44 LC Nine eight victor, roger start a right turn now sir.
 
 
 17
 1321:48 98V Nine eight victor, roger.
 
 
 18
 App. at 2441. The tone of the controller's voice indicated no urgency. A right turn was already contemplated by 98V as part of the standard overhead entry. An immediate right turn would have placed 98V inside of 737, creating a potentially dangerous situation when 737 turned from the downwind to the base leg. Whether for these or other reasons, 98V did not execute an immediate right turn.
 
 
 19
 After the controller instructed 98V to turn right at 1321:44, he inexplicably looked away from 98V, despite, as he later testified, having concluded that 98V was on a collision course with 21U. When he looked back, he gave the following instruction supposedly addressed to 21U:
 
 
 20
 1321:50 LC On the downwind, watch the traffic coming in from overhead sir!
 
 
 21
 App. at 2241. At the time of this instruction there were at least three planes on the downwind, 21U approaching midfield, 737 approaching the turn to the base leg, and 40G having just turned off the crosswind.
 
 
 22
 The controller's warning did not avert the collision. At 1322:00,[6] 98V collided with 21U at some point on the downwind leg immediately before midfield. 98V struck 21U from approximately the 4:00 o'clock position with respect to 21U, that is, from behind and to the right. The left wing tip of 98V struck the right door of 21U. 98V lost control and crashed, killing its two occupants, Rodriquez and Thomas. 21U was able to land on Caldwell's other runway.
 
 
 23
 The survivors of the deceased pilots brought suit against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. Secs. 1346(b), 2671-2680, alleging that the collision was caused by the air traffic controller's negligence. In addition, the survivors named as defendants Mario Diaz, the pilot of 21U, the flight school, Liberty Aviation, Inc., that had trained Diaz, and Days Flying Service, Inc., alleging that their negligence had also caused the collision.[7] Diaz and the United States cross-claimed against each other.
 
 
 24
 After a bench trial, the district court found in favor of the survivors and Diaz, concluding that the negligence of the air traffic controller was the sole cause of the midair collision. The court awarded the survivors total damages of $2,786,634 to be paid by the United States. The United States appeals.[8] We have jurisdiction under 28 U.S.C. Sec. 1291.
 
 II.
 The Applicable Law
 
 25
 Under the FTCA, the state law that would apply to determine the liability of "a private individual under like circumstances" applies to determine the liability of the government. 28 U.S.C. Sec. 2674. Here, the applicable law is that of New Jersey, the place of the collision.
 
 
 26
 The duties of pilots and air traffic controllers are prescribed by federal law pursuant to the Federal Aviation Act, 49 U.S.C. Secs. 1301-1557. Under 49 U.S.C. Secs. 106(g), 1348(c), the Administrator of the Federal Aviation Administration (FAA) is authorized to promulgate air traffic rules and regulations. The Administrator has exercised this authority by promulgating the Federal Aviation Regulations (FAR's) and by establishing the procedures to be followed by air traffic controllers. The FAR's have the force and effect of law. See In Re N-500L Cases, 691 F.2d 15, 28 (1st Cir.1982); Tilley v. United States, 375 F.2d 678, 680 (4th Cir.1967). The FAR's in turn require pilots to know and follow the Airman's Information Manual prepared by the FAA and FAA Advisory Circulars. 14 C.F.R. Sec. 61.105(a) (1987).
 
 
 27
 Under New Jersey law, violation of the FAR's or other regulations does not require a finding of negligence as a matter of law. Rather, such violations are treated as evidence that must be considered in determining negligence. See Horbal v. McNeil, 66 N.J. 99, 103-04, 328 A.2d 604, 606-07 (1974). Compare Gatenby v. Altoona Aviation Corp., 407 F.2d 443, 446-47 (3d Cir.1969) (under Pennsylvania law violation of FAA regulations is negligence as a matter of law).
 
 
 28
 This case comes before us following a bench trial. Our review of the district court's finding of facts, therefore, is under the "clearly erroneous" standard. Fed.R.Civ.P. 52(a). See generally Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 
 
 29
 With these legal principles in mind, we proceed to consider the relevant regulations, the district court's findings, and the evidence.
 
 III.
 Liability
 A.
 Negligence of The Air Traffic Controller
 
 30
 The district court found that the negligence of the air traffic controller was a proximate cause of the collision. Although on appeal the government argues primarily that the negligence of the 98V pilots precludes recovery by plaintiffs, it also challenges the finding that its controller was negligent.
 
 
 31
 The district court concluded that the air traffic controller was negligent in a number of respects:
 
 
 32
 In summary, the negligence of the controller consisted of his failure to comply with the applicable procedures, instructions and advisories set forth in the Federal Aviation Administration Air Traffic Control Handbook, 7110.65C, failure to provide any warning, including traffic and safety advisories concerning 21 Uniform to 98 Victor; failure to provide adequate warning including traffic and safety advisories concerning 98 Victor to 21 Uniform; carelessly directing 98 Victor to follow 737, if in fact it was 21 Uniform that he intended be followed; improperly instructing 98 Victor to start a right turn now, if that was intended to mean an emergency situation then observed by the controller; failure to issue any warning to 98 Victor and an inadequate warning to 21 Uniform despite having the time and opportunity to prevent the collision.
 
 
 33
 App. at 2416-17.
 
 
 34
 The air traffic controller's duties are set forth in the Air Traffic Control Handbook (Handbook).[9] The Handbook requires controllers to "[e]stablish the sequence of arriving and departing aircraft by requiring them to adjust flight or ground operation as necessary to achieve proper spacing." Handbook p 1100, App. at 2456. Pursuant to this duty, the Caldwell controller instructed 98V at 1321:32 to follow the "traffic coming up on midfield." App. at 2441. The controller testified that he intended by this instruction to have 98V follow 21U. Plaintiffs argued in the district court that the controller intended 98V to follow 737. The district court stated that there was evidence from which it could conclude that the controller had lost track of or forgotten about 21U but found that even if the controller intended 98V to follow 21U, the controller's instruction was negligent because "his instruction did not convey that intention." App. at 2411. At the time of the instruction, 21U was just turning onto the downwind from the crosswind and no other aircraft was closer to midfield than 737. The controller's failure to identify more specifically the plane 98V was to follow was negligent.
 
 
 35
 The Handbook also requires that controllers "[g]ive first priority to ... issuing safety advisories as required in this handbook." Handbook p 22, App. at 2469. The Handbook requires that a controller:Immediately issue/initiate an advisory to an aircraft if you are aware of another aircraft at an altitude which you believe places them in unsafe proximity.
 
 
 36
 Handbook p 33(b), App. at 2472. Indeed, the issuance of safety advisories is made a "first priority ... once the controller observes and recognizes a situation of unsafe aircraft proximity to terrain, obstacles, or uncontrolled aircraft." Handbook p 33 n. 1, App. at 2471; see also FAA Advisory Circular 90-48B p 4(e)(3)(v) (Sep. 5, 1980), App. at 2502 ("controllers' primary duties" include "issuing safety advisories when aware of safety conflicts").
 
 
 37
 Both the controller and the trainee observing the controller testified that they were aware of the collision course of 98V and 21U prior to the instruction to turn right issued to 98V at 1321:44, sixteen seconds prior to the collision. App. at 197-99, 200-02, 1708. Under these circumstances, the controller was under a duty imposed by the Handbook to issue a safety advisory to 98V.
 
 
 38
 The district court found that the instruction issued was inadequate. The controller merely said "98 Victor, roger start a right turn now." The district court found that the tone of the controller's voice as reflected by the tape itself reflected no sense of urgency whatsoever, nor did the content. The Handbook provides controllers with language to compel immediate action. Specifically, the Handbook directs controllers to "[u]se the word 'immediately' ... when expeditious compliance is required to avoid an imminent situation," and to "[u]se the word 'expedite' ... when prompt compliance is required to avoid the development of an imminent situation." Handbook paragraphs 29(a), (b), App. at 2470. In addition, the Handbook contains an example of the preferred form for safety advisories:
 
 Phraseology:
 
 39
 (Identification) TRAFFIC ALERT,
 
 ADVISE YOU TURN LEFT/RIGHT
 
 40
 (specific heading, if appropriate),
 
 
 41
 and/or
 
 CLIMB/DESCEND
 
 42
 (specific altitude, if appropriate)
 
 
 43
 IMMEDIATELY.
 
 
 44
 Handbook p 33(b), App. at 2472.
 
 
 45
 Not only did the controller fail to use any of the terms generally understood as compelling immediate action, but he also failed to advise 98V of the reason for the right turn. The Handbook instructs that when directing expeditious or prompt compliance, the controller should "if time permits, include the reason for this action." Handbook p 29(c), App. at 2470. There is no contention that time would not have permitted the controller to inform 98V that the reason for the right turn was traffic approaching on the downwind from the left, which would have conveyed to 98V the need to take the immediate right turn intended by the controller.
 
 
 46
 Because the controller's initial safety advisory was not in conformity with the Handbook and was insufficient to convey to 98V the need for immediate action recognized by the controller, the controller was negligent.
 
 
 47
 Moreover, even after the controller became aware at 1321:50 that his first advisory had not been complied with and a collision between 98V and 21U was imminent, the warning issued approximately ten seconds prior to collision, when either pilot retained the ability to take some action to avoid collision, was insufficient to notify either 98V or 21U that it was directed to them. The controller's advisory, which was now in a tone indicating urgency, was "On the downwind, watch the traffic coming in from overhead sir!" 98V was not on the downwind and so had no reason to respond. 21U was only one of at least three aircraft on the downwind and had no reason to believe the instruction was directed to it rather than one of the other two aircraft. Thus, this instruction represented a negligent performance by the controller of his duty to issue safety advisories. Hence, the district court's finding that the controller was negligent was not clearly erroneous.
 
 B.
 Negligence of The Pilots of 98V
 
 48
 As a defense, the United States pleaded and sought to prove that Thomas, who was at the controls of 98V, and Rodriquez, who was reviewing Thomas' performance, were contributorily negligent, thereby barring or at least reducing plaintiffs' recovery under New Jersey's comparative negligence scheme. The district court found that although the 98V pilots were in a position which placed 21U "directly in their path for most of the critical time," App. at 2419, they were not negligent and the controller's negligence was the sole and proximate cause of the accident. The government argues that the district court's findings are clearly erroneous because the 98V pilots were not relieved of their duty to "see and avoid" and were negligent in failing to do so.
 
 
 49
 The duty of vigilance imposed on aircraft pilots is set out in FAA regulations:
 
 
 50
 When weather conditions permit, regardless of whether an operation is conducted under [IFR] or [VFR], vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft in compliance with this section.
 
 
 51
 14 C.F.R. Sec. 91.67(a) (1987). As the district court recognized, the pilots of 98V remained subject to this duty to see and avoid even when operating in compliance with the Caldwell controller's instructions. The court stated, "It is conceded and recognized by the Court that notwithstanding the instructions, advice or even the negligence of the controller, the pilots are not relieved of their independent obligation to operate their respective aircraft safely, make the necessary observations and avoid other aircraft." App. at 2417. See Airman's Information Manual p 407(a)(1) (May 13, 1982), App. at 2496 (hereafter AIM) (even when a pilot is under control of a radar facility, the pilot is responsible to see and avoid other traffic when meteorological conditions permit).
 
 
 52
 In conjunction with the duty of vigilance, pilots are governed by right of way rules which prescribe specific actions to avoid observed aircraft. See 14 C.F.R. Sec. 91.67(c)-(f) (1987). Subsections of the regulation upon which the government relies provide that "an overtaking aircraft shall alter course to the right to pass well clear" of the overtaken aircraft, and that when "two or more aircraft are approaching an airport for the purpose of landing, the aircraft at the lower altitude has the right of way." 14 C.F.R. Sec. 91.67(e), (f) (1987). Here, 98V was overtaking 21U which was at a lower altitude. Therefore, the fact of the collision itself suggests that 98V was not following its obligation to see and avoid by yielding to 21U.
 
 
 53
 The district court, however, despite its acknowledgement that the pilots of 98V "were in a position which placed 21 Uniform directly in their path for most of the critical time," App. at 2419, declined to find that the fact of the collision gave rise to an inference of negligence. Instead, despite the absence of any evidence at all on the issue, the court stated: "The Court reasonably assumes that two experienced pilots would be and were in fact looking ahead." App. at 2419 (emphasis supplied). It then reasoned, "It may well be that they were looking and did not see or could not." App. at 2419. The district court imposed on the government the burden of ruling out the "reasonable or likely possibilit[y]" that various distractions, rather than the pilots' negligence, were the cause of 98V's failure to see 21U, App. at 2422, and held that the government failed to meet this burden. The government argues that the imposition of this burden on it was erroneous as a matter of law. We need not decide that issue if review of the evidence convinces us that the district court's finding of no negligence on the part of the pilots of 98V is clearly erroneous even under the burden of proof imposed by that court.
 
 
 54
 There was evidence at trial that to comply with the duty to see and avoid, pilots should visually scan an area 60 degrees to the left and right of center and 10 degrees up and down from the flight path. App. at 2433-34. Based on the district court's findings as to the positions of the aircraft, 21U was within this field of vision of 98V at all times after 98V reported overhead at 1321:30. The government's visibility expert, James Harris, testified that were the pilots of 98V vigilantly scanning, the probability of their detecting 21U within 10 seconds of the collision was 100 percent. App. at 2173-74, 2509. No direct testimony introduced by plaintiffs countered this conclusion.
 
 
 55
 Instead, plaintiffs introduced evidence suggesting reasons why the 98V pilots may have been distracted from their observations and suggesting that they might have been looking but were unable to see 21U. The district court appeared to find that the 98V pilots could have been distracted by the controller's directions based on the cross-examination of Harris in which he conceded that while a pilot's search is thus localized, "his probability of detecting other aircraft has been reduced or even eliminated." App. at 2220. However, there is no basis in the record to conclude that the 98V pilots were distracted, and Harris testified that his analysis of the 100% probability of detection by 98V, were the pilots scanning as required, took into account the possibility of distraction due to controller instructions. App. at 2221-22.
 
 
 56
 The other suggested distraction which the district court relied on was the possibility that the pilots of 98V may have been performing a pre-landing checklist. App. at 2420-21. Again plaintiffs introduced no evidence that it would have been appropriate for the pilots to have ceased scanning to perform a checklist. The only evidence on which the district court could have relied was the cross-examination of Harris in which he stated that his calculation of the probability of sighting 21U as 100% did not take account of such a distraction. App. at 2261. However, Harris testified that it would not be good practice to execute such a checklist when approaching the downwind leg of a crowded airport traffic pattern. App. at 2263-64. In fact, he said, "I would say that would be a very bad thing for a pilot to do from my experience with mid air collisions." App. at 2264. Although the district court stated that there were "indications that it would not be inappropriate or negligent for pilots, particularly in this type of a pattern, to be engaging in some landing checklist," App. at 2420-21, plaintiffs have directed us to no evidence, nor have we found any, that performance of a checklist in lieu of visual scanning would not be negligent.
 
 
 57
 With respect to the other basis for the district court's finding that the 98V pilots were not negligent despite the fact of the collision, plaintiffs' pilot expert, Paul Bray, testified that the ground surrounding Caldwell Airport would provide a background of buildings against which aircraft would be "very difficult to see" when observed from above. App. at 716-17. Bray did not relate this testimony to the positions of the planes in this case. In contrast, the government expert, Harris, testified that if 98V was at 200 feet above pattern altitude, as the district court found, 98V would look down at 21U at only a 2 degree angle at which angle 21U would continue to be viewed against a "hazy light, sort of scattered light clouded terrain," which would not appreciatively decrease the probability of observation. App. at 2265.[10] On the basis of this evidence, the district court found that the 98V pilots were "not negligent" in "not see[ing] other aircraft in their field of vision" because of "factors [such as] background which make the aircraft difficult to see, such as the ground in this case." App. at 2420. Since Harris' testimony assumed the planes to be precisely where the district court placed them and he testified 21U would be in sight, and Bray did not testify to the contrary using those positions, there is no evidence to support the district court's finding that background affected the observations of 98V.
 
 
 58
 In short, the government introduced evidence that if the pilots of 98V were adequately performing their duty to scan, under the VFR conditions existing at the time of the collision and with the aircraft positions as determined by the district court, they should have observed 21U. Had they done so, of course they would have been under the obligation to avoid the collision. There is no evidence other than speculation as to the activities of the pilots of 98V to counter this evidence. There is no basis in the record to support the district court's finding that the pilots were distracted or could not see 21U had they looked. Therefore, the court's finding that the pilots of 98V were not negligent in performing their duty of vigilance to see and avoid 21U was clearly erroneous.
 
 C.
 Negligence of The Pilot of 21U
 
 59
 Diaz, the pilot of 21U, survived and testified at the trial. He was a defendant in the Rodriquez/Thomas action and in the government's cross-claim. The government argues that once Diaz knew of 98V's overhead entrance he should have broadened his scan to locate it and thereafter maintain sight of it.
 
 
 60
 The district court stated that Diaz's assumption that 98V had already entered the downwind leg was faulty and that therefore Diaz was negligent in failing to look specifically for 98V when Diaz entered on the downwind. App. at 2417. The court found, however, that although Diaz did not specifically seek out 98V, Diaz thereafter "engaged in accepted and recognized scanning and did not observe 98 Victor as a result" because it was approaching from behind at his four or five o'clock position. App. at 2418. Therefore, the court found that Diaz's negligence could not be considered to be the probable cause of the collision. The court also found that Diaz "may also have been at fault" in failing to respond to the warning issued at 1321:50 instructing traffic on the downwind to "watch the traffic coming in from overhead." App. at 2418. Again, the court found that Diaz's possible negligence was not the cause of the accident because the warning came less than 10 seconds before the accident and was so vague that it was "not reasonable to expect that in those few seconds, [ ]Diaz could have looked, located 98 Victor and taken appropriate evasive action. The warning was too little [too] vague and too late." App. at 2418. The court seems to have been ambivalent about Diaz's negligence, since it thereafter concluded that "Diaz either was not negligent or if he was negligent, his negligence did not cause or contribute to the happening of the accident." App at 2418.
 
 
 61
 Assuming that the court found that Diaz was negligent,[11] we must decide whether the district court's finding of no causation is clearly erroneous. Under New Jersey law, where multiple negligent acts are alleged, if a negligent act "can fairly be regarded as sufficiently remote or insignificant in relation to the eventual accident then, in a legal sense, such fault does not constitute 'a cause of the accident.' " Brown v. United States Stove Co., 98 N.J. 155, 172, 484 A.2d 1234, 1243 (1984) (quoting Latta v. Caulfield, 79 N.J. 128, 133, 398 A.2d 91, 93 (1979)).
 
 
 62
 Diaz, although a student pilot, operated under the same duties applicable to the more experienced pilots of 98V. App. at 2316; see also Rudelson v. United States, 602 F.2d 1326, 1330 (9th Cir.1979). A pilot who is aware of an aircraft presenting a hazard has a continuing duty to maintain awareness of that aircraft. See, e.g., In re N-500L Cases, 691 F.2d at 32. This continuing duty may require a scan beyond the normal range including manipulation of the head and aircraft to eliminate blind spots caused by the aircraft. See, e.g., id.; Rudelson, 602 F.2d at 1330.
 
 
 63
 Here, however, there was no evidence that while on the downwind Diaz had any reason to believe that 98V presented a hazard to him and accordingly he had no duty to broaden his scan at that time. We construe the district court's opinion as containing the implicit finding that in light of Diaz's appropriate scanning while on the downwind, his initial failure to locate 98V was too remote to the cause of the accident to be considered a proximate cause thereof. We cannot call this clearly erroneous. In this connection we emphasize that a reviewing court may not reverse the finding of the district court "simply because it is convinced that it would have decided the case differently." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 
 
 64
 With respect to the district court's finding that Diaz' failure to respond to the controller's last warning did not proximately cause the collision, the government points to testimony that a pilot may require as little as two seconds to take action to avoid a midair collision. App. at 1923-24. However, there was other evidence, which the district court credited, that a minimum response time of 10 seconds was necessary. App. at 2430 ("minimum of 10 seconds ... for a pilot to spot traffic, identify it, realize it's a collision threat, react, and have his aircraft respond"). In light of this evidence, and the vagueness of the instruction, again we cannot conclude that the district court's finding is clearly erroneous.
 
 
 65
 Thus, we affirm the district court's finding that neither of the two actions by Diaz alleged to be negligence was a proximate cause of the collision.
 
 D.
 Comparative Negligence
 
 66
 Under the New Jersey law applicable to this case, Thomas and Rodriquez, the pilots of 98V, may recover from the United States only if their negligence is not greater than the negligence of the Caldwell controller. See Van Horn v. William Blanchard Co., 88 N.J. 91, 438 A.2d 552 (1981).[12]
 
 
 67
 The government argues that pilots operating in VFR conditions who have been found to be negligent must, as a matter of law, be held to be more negligent than the air traffic controller providing negligent instructions. In support of this proposition, the government relies on numerous cases holding that "the primary responsibility for avoiding collision ... in VFR conditions is with the pilot." In re N-500L Cases, 691 F.2d at 28; see also, e.g., Murff v. United States, 785 F.2d 552, 554 (5th Cir.) (per curiam), cert. denied, --- U.S. ----, 107 S.Ct. 95, 93 L.Ed.2d 46 (1986); Kack v. United States, 570 F.2d 754, 756 (8th Cir.1978); Tilley v. United States, 375 F.2d at 682-83; United States v. Miller, 303 F.2d 703, 710 (9th Cir.1962), cert. denied, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963); United States v. Schultetus, 277 F.2d 322, 327 (5th Cir.), cert. denied, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960).
 
 
 68
 We have previously rejected the position that a pilot's negligence in performing his duties must, as a matter of law, free the air traffic controller from liability. In Redhead v. United States, 686 F.2d 178 (3d Cir.1982), cert. denied, 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1983), where we held, unlike this case, that the controller had not been negligent, we discussed the relationship between the negligence of the pilot and controller. We stated:
 
 
 69
 Both the pilot and the air traffic controller owe a duty of care to passengers in an airplane. Negligence by the pilot does not, in and of itself, absolve the government of liability. Each is responsible for the safe conduct of the aircraft and the safety of its passengers. Thus, there may be concurrent liability.
 
 
 70
 Id. at 182 (citations omitted). Although we recognized that the pilot bears "final authority" for aircraft operation and is to be held to "the highest degree of care," we also held that air traffic controllers could be held liable if "negligence on the part of such persons [has] a causal relationship to the happening of the accident." Id.
 
 
 71
 Redhead thus makes clear that where an accident occurs in a situation where both controllers and pilots are operating under imposed duties, both the degree of negligence in performing those duties and the extent to which the negligent performance of those duties causes the accident are questions of fact. Many of the cases cited by the government have taken this same position. See, e.g., Murff, 785 F.2d at 555 (Cessna maneuvering in crowded traffic area without landing lights, without reporting location and possibly without monitoring tower held more negligent for collision than controller who provided warning of Cessna to F-27); In re N-500L Cases, 691 F.2d at 28-32 (N-500L held more negligent than controller for collision with L-1011 where controller warned N-500L of L-1011 and N-500L observed L-1011 in time to avoid wake). Indeed, we believe it would be impossible to set out a rule of law holding either pilot or controller more responsible for a given occurrence save in those situations where there is no duty imposed on one or the other. Cf. Redhead, 686 F.2d at 182 ("nature and extent of the duty of due care is a question of law"). Where, as here, the 98V pilots and controller were operating under duties imposed by regulations and both were negligent in performing their respective duties, the relative responsibility for the collision is a matter of fact. We reject the government's argument that the pilot must be more negligent than the controller as a matter of law.
 
 
 72
 Since the district court erroneously concluded that the pilot of 98V was not negligent, it did not make findings as to comparative negligence. We must remand for such findings. On remand, the district court will also have to consider the extent to which negligence should be apportioned between Rodriquez and Thomas.
 
 IV.
 Damages
 
 73
 In assessing damages, the court took into consideration the age of each decedent at the time of death, his education, work experience and qualifications, and his life and work expectancy. Only two issues as to damages are presented on appeal. The government argues that the district court's increase in the calculation of Rodriquez's future earnings by 25% to reflect the probability that Rodriquez would have obtained future full-time employment as a commercial pilot is not supported by the evidence. It also argues that the awards to the Rodriquez and Thomas families of $500,000 to reflect the loss of advice, guidance and counsel of the two decedents is excessive as a matter of law.
 
 A.
 Enhancement of Rodriquez's Lost Earnings
 
 74
 The district court enhanced the damages attributable to the death of Mr. Rodriquez because the court concluded that Rodriquez would fulfill his wish to become a full time commercial pilot. The government argues that there was insufficient evidence to support the finding that Rodriquez would have become a commercial pilot.
 
 
 75
 Under the New Jersey wrongful death statute, the finder of fact is responsible for awarding such damages as it "shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent." N.J.S.A. 2A:31-5. The measure of damages is the "deprivation of a reasonable expectation of a pecuniary advantage which would have resulted by a continuance of the life of the deceased." Curtis v. Finneran, 83 N.J. 563, 569, 417 A.2d 15, 18 (1980) (citations omitted). New Jersey case law provides that proof of the amount of such damages need not be shown with exactness, McStay v. Przychocki, 7 N.J. 456, 460, 81 A.2d 761, 763 (1951) (quoting Cooper v. Shore Electric Co., 63 N.J.L. 558, 567, 44 A. 633, 636 (E & A 1899)), affirming McStay v. Przychocki, 10 N.J.Super. 455, 463-64, 77 A.2d 276, 280-81 (1950); Greenberg v. Stanley, 51 N.J.Super. 90, 108-09, 143 A.2d 588, 598-99 (1958), aff'd in part, rev'd in part, 30 N.J. 485, 153 A.2d 833 (1959), but the plaintiff must nevertheless provide the factfinder "some evidentiary and logical basis for calculating or, at least, rationally estimating a compensatory award. '[S]heer conjecture cannot be the basis of a jury finding.' " Huddell v. Levin, 537 F.2d 726, 744 (3d Cir.1976) (quoting Dixon v. Pennsylvania Railroad, Co., 378 F.2d 392, 394 (3d Cir.1967)). Cases applying New Jersey law have upheld a finding of future employment in a particular field when there was evidence to support the likelihood that decedent would achieve that position. For example, in McGrath v. Erie Lackawanna Railroad Co., 460 F.2d 1312, 1315 (3d Cir.1972), this court upheld the damages based upon an anticipated promotion within four months of the decedent's death, where the accounting firm partner who would have made the promotion decision testified that it was a "100% certainty" that the decedent would have been promoted and there was expert testimony to support the higher salary figure. Similarly, in Kopko v. New York Live Poultry Trucking Co., 3 N.J.Misc. 498, 499, 128 A. 870, 870 (N.J.1925), the damage award was supported not only by evidence that the decedent, a 12 1/2 year old boy, had unusual aptitude and promise and marked ability as a musician, but also by expert testimony of a violin teacher that the decedent would, "because of his talent, become one of the great musicians."
 
 
 76
 The evidentiary basis for an award of damages based on earnings in an anticipated position is also demonstrated in Gluckauf v. Pine Lake Beach Club, Inc., 78 N.J.Super. 8, 21-24, 187 A.2d 357, 363-65 (1963), where the court upheld a jury award based upon the assumption that the decedent, a 15 1/2 year old boy, would work as a biochemist or in some comparable field of science. That evidence was not merely that decedent had the ambition of becoming a biochemist, but also that he had a 157 IQ, was in the top 1% of his class of 800 students in a very competitive school for gifted students, excelled in biology and mathematics, and according to his teacher "even in this bright school ... was above [the other students] in competence and diligence." See also Bohrman v. Pennsylvania Railroad Co., 23 N.J.Super. 399, 406-09, 93 A.2d 190, 193-95 (1952) (upholding jury award for death of 18-year old girl based on assumption that she would become beautician, where decedent intended to become beautician, had practically finished training in beautician's school, and worked in father's beauty shop).
 
 
 77
 The issue in this case is not whether the district court erred in selecting 25% as the amount of enhancement since New Jersey cases allow a degree of conjecture in the factfinder as to lost future earnings, depending on the nature of the case, but whether there was any credible evidence to support the district court's assumption that Rodriquez would have been a commercial pilot, which was the predicate for the enhancement.
 
 
 78
 At the time of his death, Rodriquez worked as a machinist. During the period from 1980 until his death in 1982, he worked "on and off" for his cousin's company, App. at 975, had part time jobs elsewhere, and when laid off would "go in and do odd jobs ... at his cousin's place once in a while," where "he was working off the books." App. at 976-77. He had obtained both a private and a commercial pilot's license, and was a certified flight instructor. Rodriquez's wife testified that it was Rodriquez's ambition to be a commercial pilot.[13] He flew every weekend that the weather allowed and sometimes during the week, building up hours he believed necessary to obtain a job as a pilot. In addition, he would study every evening when he was not flying. Rodriquez belonged to a flying association, and had earned money giving flying instructions.
 
 
 79
 Based on this evidence, the district court concluded that there was "a good likelihood that he would someday seek and obtain ... employment ... [as a commercial pilot] and that he had the capacity to do so." App. at 2425.[14] We believe that under New Jersey law, and particularly under the case relied on by plaintiffs, Gilborges v. Wallace, 153 N.J.Super. 121, 136-38, 379 A.2d 269, 276-77 (1977), aff'd on this issue, 78 N.J. 342, 353, 396 A.2d 338, 343 (1978), the court's conclusion was without evidential foundation.
 
 
 80
 In Gilborges, a high school student seriously injured in an accident sought to show damages of lost earnings based on an actuarial expert's opinion that she would probably have become a college graduate and thereafter a practicing veterinarian. The New Jersey Superior Court upheld the admission of testimony of the expert regarding the plaintiff's earning capacity based on the assumption that plaintiff would have gone to college even though plaintiff had not yet taken her preliminary College Boards or applied for admission to any college at the time of the accident because the court held that the expert's testimony "was within his expertise and was competent." 153 N.J.Super. at 137, 379 A.2d at 277. However, the court reversed the trial court's ruling admitting the evidence of earning capacity based upon the assumption that the plaintiff would have become a practicing veterinarian. Even though the decedent had expressed an interest in becoming a veterinarian, the court ruled:
 
 
 81
 we conclude that Dr. Leshner's opinion that Rosemarie would probably have become a practicing veterinarian was without evidential foundation. Cross-examination developed that there is no veterinary school in the State of New Jersey and only one in the State of Pennsylvania, with consequent grave difficulty of a student from New Jersey obtaining admission to such school. We find no support in the record for the conclusion that Rosemarie would probably have become a veterinarian student or graduate. We therefore consider that the assumption was purely speculative and Dr. Leshner's opinion both as to the probability that (a) she would become a veterinarian and (b) she would have earned approximately $1,000,000 in that practice was likewise speculative.
 
 
 82
 Id. at 137-38, 379 A.2d at 277.
 
 
 83
 The district court's finding that Rodriquez would have obtained future employment as a pilot is similarly speculative. Significantly, there was no testimony as to Rodriquez's ability, as there was in McGrath, Kopko and Gluckauf, even though his ambition and perseverance were demonstrated. There was no evidence through expert testimony or otherwise concerning the prerequisites for employment as a commercial pilot, and no evidence that Rodriquez possessed the needed qualifications. The fact that Rodriquez had accomplished at least one prerequisite of the job of commercial pilot by obtaining a license is not enough to support the court's assumption that he could meet the remaining qualifications, whatever they may be.
 
 
 84
 Accordingly, we must conclude that the district court's finding that Rodriquez would likely have become a commercial pilot was clearly erroneous.
 
 B.
 Intangible Loss
 
 85
 The other damages issue on appeal is the district court's award of $500,000 to each plaintiff family for lost advice, guidance and counsel. The court stated that the New Jersey courts "have always recognized that no amount of money can compensate a family for the loss of any one of its members and that the attempt to equate money with the loss in this case of advice, guidance and counsel for children, and advice, guidance and counsel and companionship for a spouse, is truly an impossible task. So recognizing this impossibility, the Court will attempt to make a fair award to both families, recognizing that there is truly no adequate compensation or substitute for what each have lost." App. at 2426. In making the award for the "irreplaceable and intangible loss each has sustained," the district court considered:
 
 
 86
 the testimony regarding the respective ages of Mr. Thomas and Mr. Rodriquez, their life expectancy, the age of their spouses and their children and their history of devotion to their families and in particular, their commitment, in each instance, to the need for education.
 
 
 87
 App. at 2426-27. The district court "balanced the greater life expectancy of Mr. Rodriquez against the greater number of children left by Mr. Thomas," App. at 2426, and decided to award an equal amount to both families. The government argues that the awards do not reflect the pecuniary element of the lost advice, guidance and counsel, but rather "are more in the nature of compensation for emotional loss which is not allowed under New Jersey law." United States' Brief at 37. The government also argues that the district court awards are so excessive as to be punitive in nature and thus not allowed against the United States under the Federal Tort Claims Act.
 
 
 88
 The New Jersey wrongful death statute limits damages "to the pecuniary injuries resulting from such death." N.J.S.A. 2A:31-5. Although as a result no compensation is allowed for emotional loss, the courts have held that surviving next of kin are entitled to the value of the companionship, advice, guidance and nurturing they lost as a result of the death. Green v. Bittner, 85 N.J. 1, 424 A.2d 210 (1980); Carter v. West Jersey & Seashore Railroad Co., 76 N.J.L. 602, 71 A. 253 (E & A 1908). See also Frasier v. Public Service Interstate Transportation Co., 244 F.2d 668, 670 (2d Cir.1957) (applying New Jersey law).
 
 
 89
 In calculating these intangible losses, generally no specific evidence of companionship, advice, guidance or nurturing is needed to sustain an award of damages. The proof that suffices is "the parent-child relationship and what we assume the jury can conclude from that relationship alone," Green v. Bittner, 85 N.J. at 15, 424 A.2d at 217, and there need not even be a showing that the parent was rendering valuable advice. Id. Thus, in Carter v. West Jersey & Seashore Railroad Co., 78 N.J.L. at 603, 71 A. at 253, the court upheld a damage award for the loss of a mother where the children lived with the deceased parents and the mother "performed the household duties." The court stated:
 
 
 90
 It was reasonably to be inferred that she took such care of her children as a mother usually takes. ... Under circumstances such as are here presented we think there is a reasonable inference that the continuance of the mother's life would have resulted in substantial pecuniary benefit to the children. ... "[I]nfant children sustain a loss from the death of their parents, and especially of their mother, of a different kind. She owes them the duty of nurture and of intellectual, moral, and physical training, and of such instruction as can only proceed from a mother."
 
 
 91
 Id. See also Clark v. Prime, 18 N.J.Misc. 226, 12 A.2d 635 (N.J.Cir.Ct., Bergen Cty.1940) (sustaining a jury award of $30,000 where the decedent left a husband and five children, finding that the award of $10,000 to the husband was comparable to similar awards in other states, and that the $4,000 left to each remaining child was reasonable).
 
 
 92
 In contrast, a jury award of $50,000 to two surviving children for the death of their mother was overturned as excessive. Melendez v. Rodde, 176 N.J.Super. 283, 286-87, 422 A.2d 1047, 1048-49 (1980). The evidence showed that the daughter lived with the grandmother and visited the mother on weekends, and there was no proof that the son lived with the mother, or proof of the mother's age, health, life expectancy, employment, whether the mother contributed financially to the children's support, or of the content of the conversations between the daughter and the mother when the daughter visited. The court stated, "There must ... be proof from which a jury can convert the loss to financial terms. Here, it was left to the speculation of the jury just what contributions both financial and by way of guidance either of the two survivors received. The evidence could not support a verdict in the amount of $50,000." Id. at 287, 422 A.2d at 1049.
 
 
 93
 Similarly, in Hudgins v. Serrano, 186 N.J.Super. 465, 476-82, 453 A.2d 218, 224-27 (1982), the court held excessive a $1,150,000 jury damage award where the decedent, a chauffeur, left a widow and four children. In calculating the point at which an award for "the lost nurture, guidance and training of the children" would shock the judicial conscience, the court multiplied the aggregate remaining years of the children's minority by 10% of the father's salary. Id. at 481, 453 A.2d at 227. In that case, however, the court noted that it did not intend that the formula used "should become a model for the calculation of nurtural damages." Id. at 481 n. 5, 453 A.2d at 227 n. 5.
 
 
 94
 In considering the government's argument that there was insufficient evidence of the pecuniary value of the decedent's services because the plaintiffs never established the comparative worth of the cost of their replacement value, we are guided by the New Jersey Supreme Court's recent statement that "[s]uch damages are regularly allowed despite the total lack of proof of such dollar value." Green, 85 N.J. at 8, 424 A.2d at 213. Moreover, the Supreme Court of New Jersey has stated that the calculation of damages need not cease after the child reaches majority. Id. But see Meehan v. Central Railroad Co. of New Jersey, 181 F.Supp. 594, 621-23 (S.D.N.Y.1960) (applying New Jersey law to award only $1,200 per child per year from the date of the verdict to age 18 for intangible losses where the decedent father had a close relationship with his five children and was concerned with and participated in their upbringing).
 
 
 95
 The evidence in this case shows that Rodriquez had a life expectancy of 43 years at the time of his death. He was survived by a wife and two children, one age three years and the other age two years. Rodriquez was clearly devoted to his family, helping his parents purchase a house and performing manual tasks around his own home such as making furniture and repairing the family cars. He would take the children to the park every day during the week as well as on other activities. Rodriquez spent approximately 10 hours a week alone with the children. Education was also very important to Rodriquez. He moved to the United States from Costa Rica at age 18, where he had received vocational training as a machinist, and he subsequently became conversant in English. Although Rodriquez did not have a college degree, he encouraged his wife to return to school to obtain a college degree, and he helped support his two brothers, now a doctor and an engineer, through college. Rodriquez's wife testified that he was a good companion to his wife and to his children.
 
 
 96
 Thomas had a life expectancy of 30.4 years when he died, and was survived by a wife and six children ages 2--16. He moved to the United States from Tobago at age 27, where he was an elementary school teacher. In the United States he studied to become an engineer, receiving a Bachelor's and a Master's degree in engineering and computer science. While working as an engineer, Thomas also attended night school, obtaining a Master's degree in business administration. Thomas was also dedicated to his family. He did mechanical and electrical work around the house, including building the family television set and repairing the family car. He also helped with cooking and cleaning. Thomas was very excited about being a father and concerned that his children receive a college education. He purchased a home computer and worked on it with the children. At the time of trial, the three oldest children were in college. Thomas spent time with the children, playing and baby sitting, took walks with his youngest child, and vacationed with the family every year.
 
 
 97
 We believe that the New Jersey courts would uphold the award to each family of $500,000 for lost companionship, guidance and nurture. This case is unlike Walters v. Mintec/International, 758 F.2d 73, 81-82 (3d Cir.1985), where we held that jury verdicts for lost guidance and counsel to minor children would not be upheld where there was no evidence of such guidance and counsel. Here, there is evidence of the decedents' devotion to their families, the importance placed by the decedents on education, and the decedents' own motivation to succeed. We cannot say that the amounts awarded were excessive.
 
 V.
 Conclusion
 
 98
 We have affirmed the district court's findings that the United States was negligent based on the negligence of the air controller; that Diaz, even if negligent, did not cause or contribute to the collision; and that each plaintiff was entitled to a damage award of $500,000 for "nurturing". We have found clearly erroneous because unsupported by the evidence the district court findings that the pilots of 98V were not negligent and the district court's enhancement of Rodriquez's damages for lost earnings by 25%.
 
 
 99
 For the foregoing reasons we will remand this action to the district court for further proceedings as between the United States and the Rodriquez and Thomas plaintiffs. The judgment as to Diaz will be affirmed.
 
 
 100
 On remand the district court may decide whether it can make the additional findings required on the basis of the record accumulated at trial and whether additional evidence will be necessary.
 
 
 101
 One half of the costs on appeal are to be paid by the United States, the other half to be paid equally by the Rodriquez and Thomas plaintiffs.
 
 
 
 *
 Hon. Jane R. Roth, United States District Court for the District of Delaware, sitting by designation
 
 
 [1]
 In a touch and go landing the pilot brings the airplane down in a normal approach as if intending to land, and, upon touching its wheels, applies power and takes off again
 
 
 [2]
 The flight of general aviation aircraft may be conducted under visual flight rules (VFR) or instrument flight rules (IFR), depending on the weather. See 14 C.F.R. Sec. 91.105 (1987). "Under VFR, a pilot directs his aircraft according to what he can see, navigating from place to place according to visual cues outside his aircraft." Redhead v. United States, 686 F.2d 178, 180 n. 1 (3d Cir.1982), cert. denied, 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1983). "Under IFR, it is presumed that pilots are unable to see either other aircraft or the ground and are guided by air traffic controllers." Id.; see also 14 C.F.R. Secs. 91.115-91.129 (1987)
 
 
 [3]
 At Caldwell, at the time of the collision, a right hand pattern on runway 22 entailed the following steps: Aircraft take off upwind and continue on a heading of 220 degrees. As soon as practicable, for noise abatement reasons, aircraft then execute a 20 degree turn to the right and continue climbing to 800 feet above ground level (at Caldwell, equivalent to 1,000 feet above mean sea level) at which point a 70 degree right turn is executed to bring the aircraft onto the crosswind leg. (The initial 20 degree noise abatement turn is optional.) Aircraft continue to climb to pattern altitude of 1,000 feet above ground level at which point a 90 degree right turn is executed to bring the aircraft onto the downwind leg which runs parallel to the runway. Once the downwind leg is completed, aircraft execute another 90 degree right turn onto the base leg and begin to descend. At a specified altitude aircraft execute a final 90 degree right turn onto the final approach leg and continue descent to landing. App. at 2490-92
 
 
 [4]
 On the date of the collision, Caldwell was on Eastern Daylight Time which is four hours earlier than Greenwich Mean Time. Thus, on Caldwell's time, 21U received clearance at 0917:40, Eastern Daylight Time. Because the FAA recording of controller communications recorded Greenwich Mean Time, all references to time will be to Greenwich Mean Time
 
 
 [5]
 In the transcript, transmissions are preceded by the time at the start of the transmission and an abbreviation to identify the speaker. LC stands for local control, that is, the Caldwell air traffic controller. Other abbreviations are for airplanes as in text
 
 
 [6]
 The time of collision is stipulated to by all parties
 
 
 [7]
 With the consent of all parties, the claims against Liberty Aviation and Days Flying Service were voluntarily dismissed with prejudice. App. at 5-6, 3149-51, 2512
 
 
 [8]
 The plaintiffs have also cross-appealed against Diaz, arguing only that Diaz should be included in any assessment of comparative negligence should the district court's conclusion that the air traffic controller was solely responsible for the collision be overturned and the case remanded. The United States, in its appeal, also seeks to have Diaz included in any assessment of comparative negligence
 
 
 [9]
 Portions of the 1982 version of the Handbook, Air Traffic Control 7110.65C (Jan. 21, 1982), were introduced into evidence by both the plaintiffs and the government. App. at 2444, 2464. Citations to the Handbook are to these exhibits
 
 
 [10]
 The government argues that as a matter of law background clutter cannot excuse a failure to observe an aircraft at a lower altitude. The government relies on United States v. Miller, 303 F.2d 703 (9th Cir.1962), cert. denied, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963), in which the Ninth Circuit held, under facts virtually identical to those here, that "mere difficulty of recognition or perception" due to background clutter would not excuse a failure to see and avoid. Id. at 707-08. We need not reach the government's contention since we conclude that there is no evidence to support a finding that 98V's observation of 21U was affected by background clutter
 
 
 [11]
 Evidence to support a finding of negligence on Diaz's part in failing to look for 98V when he entered the downwind includes the testimony of the pilot of 40G, which was sequenced behind 21U and was on the crosswind when 98V reported overhead, that upon hearing 98V report overhead he was able to and did observe 98V. App. at 1365-66. Diaz knew that 98V was making an overhead approach, App. at 1165, and that 98V was to be sequenced in front of him, App. at 1169, but, as he admitted, did not look for 98V. App. at 1164-65
 Furthermore, Diaz, as one of the aircraft on the downwind, was on notice that something more than ordinary scanning was required from the controller's warning to aircraft on the downwind, albeit vague. Diaz made no response to the warning. App. at 1166.
 
 
 [12]
 The holding in Van Horn that a plaintiff can recover against one of multiple defendants only if the plaintiff's negligence did not exceed that of the particular defendant was legislatively overturned by the New Jersey legislature's amendment of the New Jersey comparative negligence statute so that recovery is barred only if the plaintiff's negligence is "greater than the combined negligence of the persons against whom recovery is sought." N.J.S.A. 2A:15-5.1. The amendment is applicable only to "causes of action arising on or after" its effective date of December 6, 1982. 1982 N.J.Laws ch. 191 Sec. 3, reprinted in N.J.S.A. 2A:15-5.1 (West Supp.1986). Van Horn, therefore, continues to govern the instant action which arose on August 29, 1982. In any event, in light of our conclusion affirming the district court's finding that Diaz bears no responsibility for the collision, the result in this case, in which there is only one negligent defendant, is the same under either Van Horn or the amended statute
 
 
 [13]
 The government argues that the district court sustained its objection to Mrs. Rodriquez's testimony about her discussions with her husband regarding his possibilities of obtaining employment in commercial aviation. However, the district court's rulings only sustained objections as to Mrs. Rodriquez's statement that she had been told by her husband that he was being considered for employment in aviation. See App. at 982, 1237. The court clearly admitted testimony of Rodriquez's ambition to become a pilot. See App. at 994
 
 
 [14]
 The court's full reasoning is as follows:
 Although he had clearly taken steps to prepare himself for that career, and had expressed his ambition, certain other events would be necessary. He would have to further and complete his training, and then obtain employment. Of course, he already possessed the necessary license. Further, there was no testimony as to how many more hours in the air would be required, and how long it would take him to satisfy that requirement before he would be considered for such employment in the normal course. However, the Court is satisfied that he possessed the basic requirements, had manifested his dedication and expressed his ambition sufficiently clear to indicate a good likelihood that he would someday seek and obtain such employment and that he had the capacity to do so. However, since it is evident that the substantial period of time would be required in that contemplated career change by Mr. Rodriquez, the Court will not adopt the full 50 percent add on proposed by the plaintiffs['] expert. Rather, the Court will add on 25 percent to the net earnings loss of $442,995, or $110,748, making a total pecuniary loss, including loss of household services, of $721,251.
 App. at 2424-25 (emphasis added).